UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


JUSTIN B. SULLIVAN,            )
                              )
            Plaintiff,        )   CIVIL ACTION NO.
                              )   16-10713-DPW
v.                            )
                              )
DUMONT AIRCRAFT CHARTER, LLC, )
DUMONT AVIATION, LLC, and     )
KEVIN WARGO,                  )
                              )
            Defendants.       )


MEMORANDUM AND ORDER
March 7, 2019

Plaintiff Justin B. Sullivan, a former employee of Dumont Aircraft Charter, LLC, brings this lawsuit against his former employer, its affiliate, Dumont Aviation, LLC, and the owner of the businesses, Kevin Wargo (together "Defendants" or "Dumont"). Mr. Sullivan claims that the Defendants failed to pay him compensation for the work he did. The Defendants have responded with counterclaims against Mr. Sullivan, in which they contend Mr. Sullivan has unlawfully retained money he did not earn. Both parties have moved for summary judgment on Mr. Sullivan's claims. For the reasons explained below, I will grant in part and deny in part each motion.

## I. FACTUAL BACKGROUND[1]

### A.   *The Parties*

Defendant **Kevin Wargo** is a director and co-owner of the Dumont Group, LLC, a non-party to this litigation.   Defendants **Dumont Aircraft Charter, LLC** and **Dumont Aviation, LLC**, are both wholly-owned subsidiaries of the Dumont Group.   The Defendants manage and operate charter flights on Federal Aviation Administration Part 135 certificates.   These certificates permit an operator to sell charter flights on a particular plane to customers.   Dumont generally receives a percentage of the revenue, typically around 10%, from charters sold on aircrafts they operate and manage, although it does not receive revenue from every such charter.

The Plaintiff Justin B. Sullivan made his living in the aircraft charter industry as a broker.   For a time, before he was engaged as an employee, Mr. Sullivan worked as a broker selling charter to the Defendants.

---

[1]   As both parties have moved for summary judgment, I consider both of their affirmative statements of material fact in setting forth these undisputed facts.   The Defendants dispute some of what Mr. Sullivan set forth in his statement of material facts. However, Mr. Sullivan does not directly controvert or respond to the Defendants' statement of material fact, electing instead to file a "statement of material facts to which there exists a genuine issue to be tried."   Though I acknowledge that this response at least partially complies with Local Rule 56.1, Mr. Sullivan does not respond to the facts set forth in the Defendants' statement in the fashion contemplated by the Local Rule.   Under the circumstances, I will consider both the Defendants' response to Mr. Sullivan's statement of material facts and Mr. Sullivan's response to the Defendants' statement of material fact to the degree that the responses cite to, and are supported by, evidence of record.

**B.    *Mr. Sullivan's Pre-Employment Interactions with the Defendants***

<u>1.    The Cook Plane and Charter Commissions</u>

In August 2015, three months before Mr. Sullivan became an employee of Dumont, he introduced a potential aircraft customer, Gregg Cook, to Kevin Wargo.  Based on this introduction, Mr. Sullivan and Dumont agreed that Dumont would pay Mr. Sullivan $50,000 if Mr. Cook purchased an aircraft from Dumont, and that Mr. Sullivan would receive 5% of future charter sales on the aircraft.  This agreement was wholly separate from any employment relationship and did not identify any further responsibilities, conditions, or duties that Mr. Sullivan needed to perform in order to be entitled to the 5% commission.  The understanding of the parties with respect to the 5% commission was also not part of any written agreement and the agreement did not include a specific end date for residual commissions.

Mr. Cook signed an agreement to purchase the aircraft from Dumont Aircraft Sales, LLC, a subsidiary of the Dumont Group, in August 2015, and he paid a deposit at that time.  On November 1, 2015, Falcon 50-054, LLC ("Falcon"), an entity controlled by Mr. Cook, purchased an aircraft with tail number N954DP from Dumont Aircraft Sales, LLC, a Dumont affiliate that is not a defendant in this case.  Falcon also signed an agreement to pay Dumont Aircraft Charter, LLC, a 15% charter commission on flight charges.  The Cook aircraft was placed in the Defendants' charter fleet, where it would be made available to the public

3

for charter flights.  The Cook plane ceased to be part of the aircraft charter program on August 22, 2017.

On November 6, 2015, the Defendants gave the Plaintiff a check for $50,000, in accordance with their agreement regarding purchase of the Cook plane.

On December 31, 2015, the Defendants paid Mr. Sullivan his first residual commission payment, in the amount of $3,772, for the November revenue generated by Mr. Cook's plane.  On January 19, 2016, Kevin Wargo instructed Keith Wargo, the Chief Financial Officer ("CFO") for Dumont, to continue paying Mr. Sullivan the 5% commission for charter sales of Mr. Cook's plane.  On January 31, 2016, the Defendants paid Mr. Sullivan his second residual commission payment, in the amount of $11,527.78, for December 2015 charter revenue generated by the Cook plane.

Both the November and December 2015 commission payments were paid as W-2 wages with applicable withholdings.[2]  On February 18, 2016, Kevin Wargo instructed Keith Wargo, the CFO, not to pay any further commissions to Mr. Sullivan.  Dumont, nevertheless, continued to collect charter revenue from the Cook plane from January 1, 2016 through August 22, 2017, when the Cook plane left the Defendants' charter program.

---

[2]  When these payments were made, Mr. Sullivan was an employee of the Defendants.

## 2.   The Selldorff Aircraft Sale

Before Mr. Sullivan became an employee of the Defendants, he also introduced the Defendants to a second potential aircraft buyer, Frank Selldorff.  Mr. Sullivan tried to encourage Mr. Selldorff to purchase a particular Dumont aircraft, with registration number N957DP.  Mr. Selldorff decided not to purchase that plane.  Though Mr. Sullivan did not broker the sale of a different aircraft to Mr. Selldorff, he remained in contact with Kevin Wargo about Mr. Selldroff's plans after the introduction had been made.  For example, on September 2, 2015, Mr. Sullivan emailed Kevin Wargo to let him know that Mr. Selldorff seemed to be "narrowing in on a 601."  Just over one month later, Mr. Selldorff came back to Dumont and purchased a Challenger 601 from Dumont Aircraft Sales, LLC.  The sale closed on October 14, 2015.

## C.   *Mr. Sullivan's Employment with Dumont*

In September 2015, Mr. Sullivan and the Defendants began discussions about Mr. Sullivan formally joining Dumont as an employee.  During the conversations regarding his employment, Mr. Sullivan and Mr. Wargo negotiated the terms of Mr. Sullivan's compensation structure via email and during an in-person meeting.  In the electronic communications, Mr. Wargo never enumerated any deductions or withholdings from Mr. Sullivan's commission payments for costs or expenses of any kind.  However, in an email exchange from September 14, 2015, Kevin Wargo asked Mr. Sullivan about "ongoing expenses" for Mr.

Sullivan's business and, in an email dated September 25, 2015, the parties contemplated a number of "ongoing expenses," including compensation for Maria White, Mr. Sullivan's associate.

The terms of Mr. Sullivan's employment were set forth in a written agreement ("the Term Sheet") that Mr. Sullivan signed on October 19, 2015.  His employment as the Sales Director for Dumont formally began on November 4, 2015.

### 1.   The Term Sheet

The parties agree that the terms of Mr. Sullivan's employment were largely governed by the Term Sheet, which the Defendants authored.  In its initial draft, the Term Sheet contained no provisions regarding expenses.  The final version included one provision regarding expenses, noting that Mr. Sullivan's reasonable travel expenses were to be covered by the Defendants.  After several discussions and email communications regarding a structure for compensation, Mr. Sullivan and Dumont ultimately agreed to and signed a written Term Sheet agreement, which set out the terms of Mr. Sullivan's employment with Dumont and his commission-only compensation structure.  Mr. Sullivan specifically requested that he be compensated by sales commission only.  He did not ask to be paid by the hour.

Mr. Sullivan received an offer letter from the Defendants, which he signed and returned by November 4, 2015.  That offer letter incorporated the Term Sheet by reference, noting that Mr. Sullivan's "initial compensation package includes financial

compensation based on the agreement signed October 19, 2015."
It also made clear that Mr. Sullivan's start date for employment
was November 4, 2015 and that his employment was at-will.

The Term Sheet further provided that Mr. Sullivan would be
eligible for a commission on aircraft charter flight sales.
Specifically, the Term Sheet made clear that "[t]hree percent of
gross flight charges revenue sales will be allocated as sales
department commissions.  Justin may receive up to 75% of this
number leaving 25% to be split amongst the remaining team.
Under mutual agreement . . . Justin can opt to reduce his share
of the profit."  Any commission not paid to Mr. Sullivan was
retained by the Defendants.

The commission was calculated based on flight charges,
which were determined when a customer accepted a flight quote
and the Defendants added it to the flight schedule.  Flight
charges were reported to owners in monthly statements issued by
the 20th of the month following the flight activity.  Flight
charges typically did not change unless there was an issue with
the flight or the routing changed.  Mr. Sullivan's commission,
then, was calculated by adding up flight charges and paying him
the agreed percentage.  He received paychecks from Dumont
Crewing Services, LLC and Dumont Aircraft Charter, LLC.

According to the Term Sheet, Mr. Sullivan was also entitled
to a commission on aircraft sales of "50% of aircraft sales
profit, up to $100,000, for closing aircraft sales."  The Term
Sheet defined "closing aircraft sales" as follows: "Customer is

brought by Justin, worked by Justin, brought thru the process by Justin, and Justin receives the signed contract, and the transaction closes."

The Term Sheet included no reference to costs, expenses, or other money to be deducted from Mr. Sullivan's commission.

## 2.   Mr. Sullivan's Role as Sales Director

As the Sales Director, Mr. Sullivan's duties involved proactive outreach to prospective aircraft buyers to discuss aircraft sales opportunities.  Mr. Sullivan also provided quotes to customers, engaged with brokers about potential charters, and monitored air charter boards.  He regularly solicited customers over the internet and by phone.  Mr. Sullivan worked from his home in Massachusetts much of the time that he was employed by the Defendants.  He also traveled to numerous states, including Florida, New York, New Jersey, and Connecticut, to visit aircraft sales clients or for business conferences.  Mr. Sullivan rarely traveled to Delaware, where the Defendants are located, making only five or six trips there.

Mr. Sullivan does not have records of how many hours he worked per day, week, or month because he did not keep track of his hours.  However, he estimated that he worked approximately 250 hours per month based on the timestamps on his emails.  As an employee of Dumont, Mr. Sullivan also booked charter flights for the Defendants.

## 3.   Wage Issues

From November 4, 2015 to December 31, 2015, Mr. Sullivan

worked for the Defendants without receiving payment — whether in the form of wages for in his role as Sales Director or in the form of commissions for the Cook plane.   The Defendants paid Mr. Sullivan's portion of sales department commission on charter flights for this period in February 2016.   Specifically, around February 15, 2016,[3] the Defendants paid Mr. Sullivan two-thirds of the sales department commissions for November and December 2015, in the amount of $7,523.59.   The Term Sheet indicated that Mr. Sullivan would be entitled to up to 75% of the sales department commissions and, on December 29, 2015, Keith Wargo wrote an email indicating the commission calculation was 75%. Between November 4, 2015 and February 16, 2016, Mr. Sullivan and the Defendants never agreed to modify the terms of Mr. Sullivan's commission structure.

The Defendants did not pay any commissions, including for sales of charter flights, to Mr. Sullivan for the period between January 1, 2016 and February 16, 2016.   Mr. Sullivan was also not paid any commissions for any charter flights that were booked after December 31, 2015.

### 4.   Maria White & Deductions from Mr. Sullivan's Commissions

When he was engaged as an employee with the defendants, Mr. Sullivan introduced a prospective employee, Maria White, to the Defendants.   The Defendants hired Ms. White to perform flight

---

[3]  There is some indication in the record that this payment was on February 12, 2016, and other indication it was on February 15, 2016.   The exact date of the payment is immaterial.

operations work.  Ms. White was paid an annual salary of $60,000 in bi-weekly installments.  She also received employee benefits from the Defendants, including health and dental insurance.  The Defendants deducted $12,500 from Mr. Sullivan's commission payments in order to cover the wages and benefits for Ms. White despite the fact that there was no written agreement between Mr. Sullivan and the Defendants that authorized this.  Mr. Sullivan objected to this deduction on February 10, 2016 in an email to Keith Wargo.  He maintains that he and the Defendants never discussed that he would pay for Ms. White's salary or benefits out of his commission.  Kevin Wargo testified that he spoke with Mr. Sullivan and obtained his authorization to deduct the cost of Maria White's salary from Mr. Sullivan's commission.  After Mr. Sullivan's employment with the Defendants ended, Ms. White continued to work for them.

### 5.   The Saperstein Sale

During Mr. Sullivan's employment with Dumont, Guy Saperstein, a prospective aircraft buyer, signed an agreement to purchase an aircraft from Dumont and paid a non-refundable deposit of $250,000.  This sale never closed, and Mr. Saperstein ultimately filed a lawsuit against Dumont seeking a refund of his deposit.  The deposit was paid to the owner of the aircraft, through Dumont, and spent on customizing the aircraft to Mr. Saperstein's specification.  The Defendants were involved in other transactions with this plane, and they ultimately sold the improved plane to another buyer.

### 6.   Lyon Aviation Flights

When Dumont started its charter business, it struck an
agreement with another aircraft charter company, Lyon Aviation
("Lyon"), to book charter flights with Lyon.  At that point,
Dumont had not yet received its charter company certificate, and
it was seeking to build a client base for its charter business.
During Dumont's "start-up" period, it was willing to earn no
money on flights in order to build a loyal client base, and so
Dumont generated no profit on Lyon charter bookings prior to
January 1, 2016.

At the time Mr. Sullivan joined Dumont, Dumont had only one
plane on its own Part 135 charter certificate, and the other
planes Dumont considered in its "fleet" were on Lyon's charter
certificate.  Lyon's charter certificate covered approximately
12 planes.  During Mr. Sullivan's employment, in emails with
Kevin Wargo, Mr. Sullivan referenced their agreement, indicating
that he expected to be compensated on the Lyon bookings.  The
Defendants did not object to this understanding or correct Mr.
Sullivan's impression.  In fact, Mr. Sullivan was instructed to
ease up on booking flights on planes on Lyon's certificate
because he was already being compensated on these flights and
the increased wear on the planes could lead to maintenance
problems.  Moreover, representatives from Lyon and Dumont met
during Mr. Sullivan's employment and agreed that Lyon would
receive revenue when a charter was sold on a plane on their
certificate and that Mr. Sullivan would be commissioned

regardless of who sold the trip or what certificate the charter flew on.

The Defendants did not calculate the charter commission portion of Mr. Sullivan's commission until after they had developed concerns with Mr. Sullivan's performance.  At that point the Defendants excluded Lyon bookings from Mr. Sullivan's charter commission.  Before that point, however, the Defendants had paid Mr. Sullivan for some charter activity on planes on Lyon's certificate.

The Defendants collected gross flight charge revenue from charter customers and reported this income to plane owners on monthly customer statements.  This revenue was reflected under "Aircraft Income" on monthly statements, regardless of whether the plane was on Lyon's or Dumont's certificate.  In addition to collecting gross flight charges, building a client base, and keeping individual plane owners happy with high plane utilization, Dumont also received monthly income from owners for each plane in its fleet, including those on Lyon's certificate.  The monthly income included a monthly hangar rent of $4000 and a monthly management fee of $4000.  In addition, flying charters added wear and tear to the planes, which generated maintenance income for Dumont.

> 7.   Owner Flights, Dry Leases, and Other Revenue

An "owner" flight, when a person who owns an aircraft books a charter flight on that aircraft, does not generate any revenue for Dumont.  The owner of the aircraft pays only the operating

costs and expenses related to the flight.  Because Mr. Sullivan
was only entitled to a commission if a flight generated revenue,
he was not entitled to, and does not seek, commissions for owner
flights.

Dry lease flights, where one owner books a flight on
another owner's aircraft, and all other instances of someone
other than the aircraft's owner flying on their own plane, is
flight activity that is reported to aircraft owners as aircraft
revenue.  Any dry lease flights that occurred during Mr.
Sullivan's employment were set up prior to his start date.  Mr.
Sullivan did not contemplate whether dry leases were excluded
from the contract when he negotiated the terms of the employment
agreement with Dumont.

### 8.   Mr. Sullivan's Departure from Dumont

Just before Mr. Sullivan left Dumont, Dumont discovered
that Mr. Sullivan had accepted a charter client's payment
directly and had failed to remit the entire payment to Dumont.
Mr. Sullivan ultimately paid the balance of the funds owed to
Dumont after Dumont's accounting department discovered this
payment and asked Mr. Sullivan to return the money.

In an email exchange on February 16, 2016, Mr. Sullivan
voluntarily terminated his employment and the parties outlined
an agreement to separate and move forward.  It was Dumont's
understanding that the parties had agreed to part ways amicably,
with no past or future monetary obligations owed by either side.
In this email exchange, Mr. Sullivan did not mention being owed

any commissions or compensation; nor did he indicate that he was owed commissions in perpetuity after his employment had ended. However, Mr. Sullivan did indicate that he believed Ms. White's wages and benefits were being improperly deducted from his pay and that his commission statement had excluded significant gross charter revenue flight activity.

## II. PROCEDURAL BACKGROUND

On April 13, 2016, Mr. Sullivan filed this action alleging violations of the Massachusetts Wage Act (the "Wage Act") M.G.L c. 149 § 148, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, breach of contract, and unjust enrichment and quantum meruit.  After the Defendants filed a motion to dismiss, I allowed Mr. Sullivan to file an amended complaint.

On April 11, 2017, Mr. Sullivan filed a motion to compel the Defendants to comply with discovery, alleging that the Defendants had refused to produce documents necessary to calculate his unpaid commissions.  On April 25, 2017, I referred the case to Magistrate Judge Donald L. Cabell.  Judge Cabell heard argument from the parties concerning the motion to compel discovery, and on May 26, 2017, he ruled that the motion should be allowed in part and denied in part.

On July 5, 2017, Mr. Sullivan filed a motion for sanctions under Rule 37 because the Defendants had failed to produce owner statements, records of flight activity, and other relevant discovery materials.  The Defendants filed an opposition on July 26, 2017.  On September 12, 2017, Judge Cabell granted the

motion for sanctions, ordering the Defendants to pay Mr. Sullivan's "reasonable fees incurred in filing the motion for sanctions." On September 26, 2017, the Defendants filed an objection to Judge Cabell's order.

On February 16, 2018, the Defendants filed a motion for partial summary judgment, requesting summary judgment in their favor on "each of Counts I through V."[4] The same day, Mr. Sullivan filed a motion for partial summary judgment on Counts I, II, and III, and sought dismissal of the Defendants' counterclaims.

On March 9, 2018, Mr. Sullivan filed a motion to strike the Defendants' motion for summary judgment on two grounds. First, Mr. Sullivan requested that the Defendants' motion be stricken to the extent it exceeded twenty pages. Alternatively, Mr. Sullivan requested that the motion be stricken in its entirety because the Defendants' counsel failed to meet and confer with Mr. Sullivan's counsel prior to filing the motion. On March 23, 2018, the Defendants filed an opposition to the motion to strike.

On May 13, 2018, I held a hearing on the motions for summary judgment and Mr. Sullivan's motion to strike. Recognizing the complexity of the factual record in this case, I sought further briefing from the parties with respect to certain

---

[4] Mr. Sullivan has only alleged four claims against the Defendants.

elements of the factual record.  The parties thereafter filed
supplemental submissions.

The objection to Judge Cabell's order, the motions for
summary judgment, and the motion to strike are now ripe for
review and resolution by me.  I will first address the motion to
strike because its disposition frames how I approach the motions
for summary judgment.  I will then turn to the motions for
summary judgment.  Finally, I will address the Defendants'
objections to Judge Cabell's order.

### III. MOTION TO STRIKE

Mr. Sullivan has moved to strike the portion of the
Defendants' memorandum in support of their motion for summary
judgment that exceeds twenty pages because the extra two and a
half pages violate the local rules of this court concerning
length of filings.  *See* D. MASS. R. 7.1(b)(4) ("Memoranda
supporting or opposing allowance of motions shall not, without
leave of court, exceed 20 pages, double-spaced.").
Alternatively, Mr. Sullivan moves to strike the entirety of the
Defendants' motion for summary judgment because the Defendants
failed to meet and confer with Mr. Sullivan prior to filing
their motion.  *See* D. MASS. R. 7.1(a)(2) ("No motion shall be
filed unless counsel certify that they have conferred and have
attempted in good faith to resolve or narrow the issue.").

There is no dispute that the Defendants did not seek leave
of the court to file a memorandum that exceeded twenty pages.
Nor is there any dispute that the Defendants failed to meet and

confer with Mr. Sullivan prior to filing the present motion for summary judgment, even if Mr. Sullivan similarly reneged on this obligation.

Though these violations of the local rules are irksome, I will not exclude the final two and a half pages of the Defendants' memorandum.  I will also not strike the entirety of Defendants' memorandum in support of the motion because their counsel did not bother to meet and confer with Mr. Sullivan's counsel prior to filing oversized submissions in connection with their motion for summary judgment.  While Defendants should have been more attentive to the letter of the Local Rule, I will consider the entirety of the memorandum submitted, especially since my concern, as I indicated during the May 23, 2018 hearing, is to reach a just resolution *on the merits*.

Consequently, Mr. Sullivan's motion to strike will be denied.

### IV. MOTIONS FOR SUMMARY JUDGMENT

### A.   *Standard of Review*

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A dispute is 'genuine' if 'a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party.'"  *Velazquez-Perez* v. *Developers Diversified Realty Corp.*, 753 F.3d 265, 270 (1st Cir. 2014) (quoting *Triangle Trading Co.* v. *Robroy Indus.*, 200 F.3d 1, 2 (1st Cir. 1999)).

17

"A fact is 'material' only if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" *Vineberg* v. *Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008) (quoting *Cadle Co.* v. *Hayes*, 116 F.3d 957, 960 (1st Cir. 1997)) (citation and internal quotation marks omitted).   In deciding the motion, I draw all reasonable inferences in favor of the nonmovant.   *Id.*

At summary judgment, "the onus falls upon the moving party to aver 'an absence of evidence to support the nonmoving party's case.'"   *LeBlanc* v. *Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir. 1993) (quoting *Garside* v. *Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)) (citation and internal quotation marks omitted).   The burden then shifts to the nonmovant to present evidence sufficient to allow a finding in its favor at trial. *Id.* at 841-42.

"Cross-motions [for summary judgment] . . . require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *School Union No. 37* v. *United Nat. Ins. Co.*, 617 F.3d 554, 559 (1st Cir. 2010) (quoting *Littlefield* v. *Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004)) (citation and internal quotation marks omitted).   Each motion must be considered separately, with inferences drawn "against each movant in turn."   *Merchants Ins. Co. of N.H., Inc.* v. *U.S. Fidelity & Guar. Co.*, 143 F.3d 5, 7 (1st Cir. 1998).

**B.   *Analysis***

Both parties here have moved for summary judgment on the claims under the Wage Act, the FLSA, and the common law claims. Mr. Sullivan argues that Defendants violated the Wage Act by failing to pay him any wages in November 2015, failing to pay him the 75% commission rate he was entitled to in November and December 2015, deducting Ms. White's salary from his commission in November and December 2015, and failing to pay him any wages or commissions after December 31, 2015.  Mr. Sullivan also contends that the Defendants violated the FLSA by failing to timely pay him the minimum wage during the term of his employment.  He argues that the Defendants breached their contract with him by failing to pay him a 5% commission on charter flights on the Cook plane beginning on January 1, 2016. Finally, Mr. Sullivan argues that the Defendants' counterclaim should be dismissed because they have failed to allege a compensable injury.

Unlike that of Mr. Sullivan, the Defendants' motion for summary judgment focuses on individual transactions, rather than on the individual claims.  At its core, however, the Defendants' motion rests on their argument that Mr. Sullivan was not entitled to any wages during his term of employment, that he falls outside the scope of the FLSA because he is an "outside salesperson," and that his common law claims for breach of contract and unjust enrichment are preempted by the FLSA.

19

The Defendants also contend that Mr. Sullivan's emotional distress claim is preempted by the FLSA and that neither a claim for a breach of contract nor a claim under the Wage Act allow for emotional distress damages.  Though Mr. Sullivan's counsel initially contended that emotional distress may be recoverable in some circumstances, Mr. Sullivan ultimately waived his claim for emotional distress.  Consequently, I need not consider emotional distress when deciding the present motions for summary judgment.[5]

Though I am mindful of the need to treat each motion for summary judgment independently, it strikes me as appropriate here to evaluate the two motions together, especially since the arguments made in the two sets of memoranda are identical.  In the interest of brevity, and clarity, then, I will address the two summary judgment motions and proceed claim by claim, addressing particular transactions simultaneously as necessary.

---

[5] Even if the claim had not been waived, I am satisfied Mr. Sullivan could not recover for emotional distress.  "[D]amages for mental suffering are generally not recoverable in an action for breach of contract." *John Hancock Mut. Life Ins. Co.* v. *Banerji*, 858 N.E.2d 277, 288 (Mass. 2006).  However, "[d]amages for emotional distress may be recovered if they result from physical harm, . . . or are the result of intentional or reckless conduct of an extreme and outrageous nature." *Id.* (citations omitted).  There are no allegations here that Mr. Sullivan suffered any physical harm or that the Defendants engaged in the kind of extreme and outrageous conduct that would warrant emotional distress damages.

1.    The Wage Act Claim[6]

Mr. Sullivan first brings a claim against Dumont for violations of the Massachusetts Wage Act ("the Wage Act").   The Wage Act is intended to "prevent an employer from unreasonably detaining an employee's wages" by providing "a cause of action for loss of wages and other benefits."  *McAleer* v. *Prudential Ins. Co. of America*, 928 F. Supp. 2d 280, 287 (D. Mass. 2013). It applies to "the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable." M.G.L. c. 149, § 148.  "Massachusetts courts have held that 'definitely determined' means that 'the amount owed the plaintiff [is] arithmetically determinable.'"  *Comley* v. *Media*

---

[6] During the May 23, 2018 hearing, Plaintiff's counsel conceded that the claims relating to payment with respect to the Cook plane fall outside the scope of the Wage Act because the agreement between the parties with respect to that particular aircraft was entered into before Mr. Sullivan became an employee of Dumont.  Based on my discussion with counsel during that hearing, I conclude that the Selldorff sale, which was also pre-employment, also falls outside the scope of the Wage Act, which governs specifically the relationship between employers and employees.  *See also* M.G.L. c. 149 §§ 148.  Consequently, the claims with respect to these two transactions also fall outside the scope of the Fair Labor Standards Act ("FLSA").

Furthermore, Mr. Sullivan only argues that he can recover money for the Saperstein aircraft under a theory of unjust enrichment and does not raise this claim as part of his claims under the Wage Act.

Therefore, I will not consider the arguments made by either party with respect to the Cook plane, the Selldorf plane, or the Saperstein plane here. All three transactions are addressed below, with respect to Mr. Sullivan's claims for breach of contract and unjust enrichment.

*Planning Grp.*, 108 F. Supp. 3d 6, 10 (D. Mass. 2015) (quoting
*Wiedmann* v. *The Bradford Grp., Inc.*, 831 N.E.2d 304, 312 (Mass.
2005), *superseded by statute on other grounds*, M.G.L. c. 149,
§ 150 (internal quotation marks omitted).   The Wage Act also
makes clear that employers must pay their employees weekly, bi-
weekly, or, only if elected by the employee, monthly, and that
this payment schedule is to be followed without exception.
M.G.L. c. 149, § 148 ("No person shall by a special contract
with an employee or by any other means exempt himself from this
section.").

Mr. Sullivan's Wage Act claim rests on his allegation that
Defendants violated the terms of the statute in four ways:
first, by failing to pay him 75% of sales commissions, the term
he contends was agreed to in his employment contract; second, by
deducting Ms. White's salary from Mr. Sullivan's commission
payments without his authorization; third, by failing to pay him
the minimum wage, or any wage at all, from November 4, 2015
until December 31, 2015; and finally, by failing to pay him for
any work performed after January 1, 2016.

The Defendants respond to these allegations by arguing that
their conduct was consistent with the understanding of the
parties, as evidenced both in the Term Sheet and in
conversations between Mr. Sullivan and Mr. Wargo.   The
Defendants also argue that Mr. Sullivan is not entitled to post-
employment commission payments because there is no reference in
the Term Sheet to whether he would be paid after the termination

of his employment.  Even if Mr. Sullivan could show that he was
entitled to post-employment commissions, the Wage Act would not
apply because future commissions were not "definitely
determined" at the time Mr. Sullivan quit.

I address each basis raised by Mr. Sullivan in turn.

   *a.  The 75% Sales Commission*

Mr. Sullivan first contends that the Defendants violated
the Wage Act by failing to pay him in accordance with the Term
Sheet.  Essentially, Mr. Sullivan maintains that the Term Sheet
dictated that he be paid 75% of the sales department's
commissions unless the parties mutually agreed upon a lesser
amount.  Although Mr. Sullivan never agreed to a reduction, the
Defendants only paid him two-thirds of the sales department's
commissions, essentially withholding wages he had properly
earned.  The Defendants dispute Mr. Sullivan's interpretation of
that contract term, arguing that the Term Sheet does not require
he be paid a 75% commission and that the interpretation of this
provision of the Term Sheet presents a genuine issue of material
fact precluding the entry of summary judgment.

The interpretation of a contract is "a question of law for
the court" and courts "generally will accord no deference to a
party's interpretation of a contract but, rather, will focus on
the language of the instrument to effectuate its terms." *Balles*
v. *Babcock Power Inc.*, 70 N.E.3d 905, 911 n. 12 (Mass. 2017).
"The determination of ambiguity in a contract is also a question
of law." *Id.* at 911 (internal citations omitted).  Language in

a contract is ambiguous when it "can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." *Id.* However, if a contract is unambiguous, "it must be construed according to its plain meaning." *Id.* When a contract's terms contain ambiguity, I may consider extrinsic evidence to determine the meaning of the contract. *Id.* at 911-12.

Additionally, when contractual language is ambiguous, "it is construed against the drafter, 'if the circumstances surrounding its use . . . do not indicate the intended meaning of the language.'" *James B. Nutter & Co.* v. *Estate of Murphy*, 88 N.E.3d 1133, 1139 (Mass. 2018) (quoting *Merrimack Valley Nat'l Bank* v. *Baird*, 363 N.E.2d 688 (Mass. 1977)). "The author of the ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party." *Id.* (citation and internal quotation marks omitted). Finally, contracts are to be construed as a whole, "so as 'to give reasonable effect to each of [their] provisions.'" *Id.* (quoting *J.A. Sullivan Corp.* v. *Commonwealth*, 494 N.E.2d 374 (Mass. 1986)).

The parties emphasize different portions of the Term Sheet in support of their contradictory claims about the meaning of the contract and the wages that Mr. Sullivan was owed. Fundamentally, the parties differ on how to properly interpret a provision that says Mr. Sullivan "may receive up to 75%" of the "three percent of gross flight charges revenue sales" that is

"allocated as sales department commissions." [*See* Dkt. No. 94-24, Term Sheet].   Mr. Sullivan emphasizes the fact that, immediately following this provision, the Term Sheet contains language that notes that "[u]nder mutual agreement (Dumont/Justin), Justin can opt to reduce his share of the profit." [*Id.*]   The Defendants focus on the fact that the language clearly states Mr. Sullivan may receive *up to* 75%, but does not guarantee, at least not clearly, that he will receive *at least* 75%.

Reading the contract as a whole, I conclude that the Term Sheet is not ambiguous as a matter of law and that Mr. Sullivan's understanding of the relevant provision is the correct one.   The Defendants' interpretation of the contract would effectively render the language that the parties could, by mutual agreement, reduce Mr. Sullivan's share of the profit meaningless.   It would allow the Defendants, unilaterally, to pay Mr. Sullivan below the 75% rate set by the Term Sheet, meaning the requirement that the parties mutually agree to lower Mr. Sullivan's rate of pay would be superfluous.

Even if the contract were ambiguous, there is no dispute that the Defendants drafted the Term Sheet and that Mr. Sullivan's understanding of the term sheet was reasonable. Under Massachusetts law, then, Mr. Sullivan's interpretation would govern because the ambiguous language would be construed against the drafter.   *See James B. Nutter & Co.*, 88 N.E.3d at 1139.   Finally, there is extrinsic evidence confirming Mr.

Sullivan's interpretation of the relevant provision.  Keith Wargo emailed Mr. Sullivan on December 29, 2015, confirming that Mr. Sullivan had a conversation with Kevin Wargo that indicated Mr. Sullivan would receive two different types of commission for his work.  One would be "the 75% of 3% of total charter revenue."  There is also no evidence on the record that Mr. Sullivan ever agreed to a reduced percentage.

Consequently, Mr. Sullivan is entitled to 75% of the sales commissions as provided in the Term Sheet, and is entitled to recover the difference between what he was, in fact, paid, and the amount owed on "gross flight charge revenues sales" for the period of his employment.[7]

### b.   Ms. White's Salary

Mr. Sullivan next contends that the Defendants violated the Wage Act by deducting Ms. White's salary from his commission earnings, thereby paying him less than he was owed under the Term Sheet.  The Term Sheet, he argues, contains no language about Ms. White's compensation and certainly does not operate to make him responsible for paying her salary.  The Defendants in turn argue that genuine issues of material fact preclude summary judgment on this claim because Mr. Sullivan had verbally agreed

---

[7] There is some dispute about what should properly be included in a calculation of the sales commissions.  In particular, the parties disagree about what constitutes "gross flight chare revenues sales."  I will address this question below, along with my consideration of Mr. Sullivan's claims that Dumont's failure to pay him the minimum wage from November 4 to December 31, 2015, and its failure to pay him for any work performed after January 1, 2016, constituted violations of the Wage Act.

to deduct the cost of Ms. White's salary from his commission during negotiations over the terms of his employment.

Mr. Sullivan treats the Term Sheet as a final written contract, intended by the parties as a statement of their complete agreement.  By contrast, the Defendants treat the Term Sheet as just one portion of the agreement they struck with Mr. Sullivan, encouraging me to consider oral agreements struck between the parties prior to the Term Sheet being finalized and signed.  As a general rule, "[w]ritten agreements may not be varied or added to by parol evidence of antecedent or contemporaneous negotiations." *Winchester Gables, Inc.* v. *Host Marriott Corp.*, 875 N.E.2d 527, 533 (Mass. App. Ct. 2007) (citation and internal quotation marks omitted).  However, the parol evidence rule only applies where it is clear that the written contract was "intended by the parties as a statement of their complete agreement." *Id.*  Here, the Term Sheet does not include an integration clause indicating that it represented the complete agreement between the parties with respect to the conditions of Mr. Sullivan's employment, meaning it is not immediately clear the Term Sheet did, in fact, represent the complete agreement.

Nor is it immediately clear that the agreement between the parties with respect to Ms. White should be considered part of the agreement evidenced by the Term Sheet at all.  Indeed, the parties suggested to me during the May 2018 hearing that the agreement relating to Ms. White may be part of a separate

agreement about Mr. Sullivan's cost structure.  Mr. Wargo
testified that he and Mr. Sullivan orally agreed that Dumont
would hire Ms. White at Mr. Sullivan's request so long as her
salary came out of Mr. Sullivan's earnings prior to signing the
Term Sheet.

Mr. Sullivan does not contest that this conversation took
place, but argues that he never agreed to have Ms. White's
salary and benefits deducted from his wages.  The conversation,
he argued, included a discussion of Mr. Sullivan's other
expenses, including his travel and software costs.  These other
terms were ultimately rejected during negotiations, Mr. Sullivan
argues, and the entirety of what the parties agreed to was
included in the Term Sheet, meaning any conversation about Ms.
White's salary may not be considered an independent agreement.

In attempting to exclude any extrinsic evidence, Mr.
Sullivan contends that any prior oral agreement regarding Ms.
White's salary would vary the unambiguous terms of the contract.
However, there are no words in the contract regarding deductions
or Ms. White, or regarding any of Mr. Sullivan's expenses.
Accordingly, I may consider evidence of record concerning a
prior oral agreement without "varying" the unambiguous terms of
the contract.

Mr. Sullivan also argues that, by considering parol
evidence about Ms. White's salary, I am essentially inferring a
term into the contract.  While I may do so when the "parties to
an agreement entirely fail to foresee the situation which later

occurs and gives rise to the dispute," I may not do so when, as here, the parties specifically discussed, and ultimately rejected, a particular contract term. *John Hancock Life Ins. Co.* v. *Abbott Labs.*, 863 F.3d 23, 37-38 (1st Cir. 2017) (internal citations omitted); *see also Alternative Energy, Inc.* v. *St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 35 (1st Cir. 2001) ("A contract need not negate every possible construction of its terms in order to be unambiguous.").

However, allowing the Defendants to introduce evidence from Mr. Wargo that he had come to an agreement with Mr. Sullivan about Ms. White's salary would not require me to infer an agreement within the contract.  The problem is not that the Term Sheet failed to negate every possible construction of its terms; it is that there is no reference in it whatsoever to deductions or allocation of Mr. Sullivan's expenses; nor does it clearly state that it constitutes the entirely of the parties' agreement.  What is more, Defendants have introduced evidence into the record to suggest that there was a separate agreement between the parties regarding Ms. White's salary, giving rise to a triable question of fact about the existence and validity of such an agreement. Consequently, I will deny Mr. Sullivan's motion for summary judgment with respect to this aspect of his Wage Act claim.

c.   *Failure to Pay the Minimum Wage*

Mr. Sullivan next contends that the Defendants violated the Wage Act because they failed to pay him his commission on

revenue earned between November 4, 2015 and December 31, 2015

until December 31st, and that they failed to pay him any wages

from January 1, 2016 to the end of his employment on February

16, 2016, in contravention of the requirements of the Act.[8]  The

Defendants' response is three-fold: first, they point to the

fact that Mr. Sullivan was paid the commissions to which he was

entitled for these dates; second, they contend that commissions

are only covered by the Wage Act when they have been definitely

determined and become due and payable; finally, they argue that,

with respect to the wages owed between January 1 and February

16, 2016, the parties have an agreement that discharges any

monetary claims Mr. Sullivan may have.  The Defendants' motion

for summary judgment on the Wage Act claim rests on the same

three assertions.

Leaving aside the question of discharge for the moment,

both Mr. Sullivan's and the Defendants' arguments with respect

to this element of the Wage Act claim depend on the

interpretation of the phrase "gross flight charge revenue sales"

in the Term Sheet.  In particular, the parties disagree about

what revenue should be included in determining this figure, and

when this figure would have been "definitely determined" under

the Wage Act.  Their disagreement focuses on two categories[9] of

---

[8] There is no dispute here that Mr. Sullivan was not paid his
first commission until December 31, 2015, though his employment
started on November 4, 2015.

[9]  Though originally raised, there is no longer a dispute that
Mr. Sullivan is not entitled to any commissions for owner
flights.

flight sales – charters from Lyon Aviation flights prior to
January 1, 2016 and flights booked prior to Mr. Sullivan's
employment, including all bookings related to dry leases.  These
categories of charter flights, the Defendants argue, did not
result in any revenue for Dumont, meaning Mr. Sullivan was not
entitled to any commission from these flights.

> ### d.   *The Lyon Aviation Flights*

As a preliminary matter, the parties do not dispute that
Dumont did not earn a profit from any of the Lyon Aviation
flights prior to January 1, 2016.  Consequently, the Defendants
argue, the Lyon flights generated no revenue and should not be
considered when calculating the gross flight charge revenue
sales.  Mr. Sullivan disputes this and contends that the
Defendants have conflated revenue with profit, meaning he was
entitled to receive a commission on the Lyon charter flights.
At the very least, then, there is a genuine dispute of material
fact regarding the scope of the term "gross flight charge
revenue sales" in the Term Sheet, especially because Mr.
Sullivan is able to point to revenue that Dumont was reporting
on Lyon charter flights.[10]

The Defendants also argue that nothing in the Term Sheet

---

[10] The Defendants also argue that because Mr. Sullivan failed to
dispute in his response to their statement of material facts
that Dumont did not earn any revenue or commissions on Lyon-
booked flights prior to January 1, 2016, that fact must be
deemed admitted.  However, Mr. Sullivan's response to the
Defendants' statement of material facts does dispute this
contention, noting that Lyon flights were generating revenue for
the Defendants while he was an employee.

explicitly includes the Lyon flights.  However, there is also nothing in the Term Sheet that excludes Lyon flights, and there is evidence of record indicating that Mr. Sullivan was informed that he was "already getting paid" for flights on Lyon's certificate.  As with the question of Ms. White's salary then, the question whether Mr. Sullivan was entitled to a commission from the Lyon flights at least raises a triable issue of fact that cannot be resolved at summary judgment.

To the extent that Mr. Sullivan relies on the fact that he had previously been paid commissions for some Lyon flights to bolster his argument that he is owed commissions on other Lyon flights, the Defendants make clear that their counterclaims are partially based on these mistaken payments to Mr. Sullivan. They contend that they never intended to pay him for any Lyon flights, and to the extent they did, he was unjustly enriched. Though it bears on the proper resolution of Defendants' counterclaims, this argument does not otherwise support summary judgment here with respect to Mr. Sullivan's Wage Act Claim.

However, even if there is a triable issue of fact with respect to what Mr. Sullivan was owed, if anything, on the Lyon Aircraft flights, Mr. Sullivan must still show that the commissions were "definitely determinable" to succeed on a Wage Act claim.  The Defendants have produced evidence, in the form of Mr. Wargo's deposition, that indicates Dumont would not know the price or cost of flights booked through Lyon Aviation until around the 20th day of the month following the flight.  Although

the parties cannot, by law, contract around the requirements of the Wage Act, the Wage Act was inapplicable until such time as the commissions became arithmetically determinable, and Mr. Sullivan has failed to rebut the Defendants' evidence that the commissions on the Lyon Aircraft flights were not definitely determinable until, at the earliest, December 20, 2015.

Consequently, Mr. Sullivan's argument that payment of his commission for Lyon Aircraft flights for November and December 2015 was unlawfully delayed fails as a matter of law.  To the extent that Mr. Sullivan's commission, when it was paid, excluded the commission earned on the Lyon Aircraft flights, he is entitled to recover that money.

> e.   *Dry Leases and Flights Booked Prior to Employment*

The Defendants contend that Mr. Sullivan was not entitled to earn a commission for flights booked before his employment start date and with which he was not involved.  The Defendants further contend that Mr. Sullivan did not sell any dry lease flights during the period of his employment, so Mr. Sullivan is entitled to no commissions from any dry lease flights that took place during his employment period.  The Defendants also point to the fact that commissions for dry lease flights were never explicitly memorialized in the Term Sheet.

Mr. Sullivan argues that the fact that dry lease flights were not explicitly mentioned in the Term Sheet does not mean that they were to be excluded.  Therefore, the contract itself, which does not carve out an exception for the dry lease flights

booked before Mr. Sullivan's employment began, is at best
ambiguous.  Moreover, even if the dry lease flights were booked
before Mr. Sullivan's employment period, Dumont charged owners
for dry leases when the flights took place, meaning Dumont
earned revenue on those flights during Mr. Sullivan's employment
period.  Since the Term Sheet does not condition Mr. Sullivan's
commission on when the flights were booked, he is entitled to
earn a commission on these flights.

There is nothing in the Term Sheet that excludes flight
bookings with which Mr. Sullivan was not involved from the gross
flight charge revenue sales.  Nor is there any mention in the
Term Sheet that certain kinds of flights would not count toward
gross flight revenue.  Instead, the Term Sheet guarantees Mr.
Sullivan 75% of the three percent of gross flight charge
revenues that are allocated as sales department commissions
without any reference to timing.  As to the question of whether
revenue was generated, it appears that, based on the invoices,
some revenue was generated by these dry leases, or at least
revenue was reported to the owners.

I find that there exists a triable issue of material fact
whether the dry lease flights are included within the gross
flight charge revenue sales, including those booked before Mr.
Sullivan's start date.  Consequently, I will deny summary
judgment on the Wage Act claim with respect to the question
whether Mr. Sullivan was entitled to earn commissions for the
dry lease flights as he contends.

   *f. Failure to Pay After January 1, 2016*

   Finally, the Defendants contend that they reached a mutual agreement with Mr. Sullivan at the time his employment ended in which both parties agreed to give up monetary claims against the other.  Consequently, Defendants argue, even if Mr. Sullivan is entitled to wage payments after January 1, 2016, they can no longer be held liable for those payments because of this discharge.  This argument fails as a matter of law.

   The Wage Act makes clear that "[n]o person shall by a special contract with an employee or by any other means exempt himself from [the Wage Act]."  M.G.L. c. 149 § 148.  That is, "[a]n agreement to circumvent the Wage Act is illegal even when 'the arrangement is voluntary and assented to.'"  *Melia* v. *Zenhire, Inc.*, 967 N.E.2d 580, 587-88 (Mass. 2012) (quoting *Camara* v. *Attorney Gen.*, 941 N.E.2d 1118 (Mass. 2011)).

   It is undisputed that the Defendants paid Mr. Sullivan his portion of the sales department commission for charter sales in November and December 2015 on February 12, 2016.  It is also undisputed that he was not compensated for any work he did in January or February 2016.  The reasons the Defendants gave for not paying Mr. Sullivan are immaterial.[11]  In failing to pay him for the time he worked for them in January and February 2016, the Defendants violated the Wage Act.  The agreement between the

---

[11]  This is true regardless of whether Mr. Sullivan agreed to waive his rights under the Wage Act.  *See Melia*, 967 N.E.2d at 588.

parties to discharge any monetary obligations, then, does not require me to grant summary judgment to the Defendants on the Wage Act claim.

### g.   Conclusion

For the reasons stated above, I find that there exists a triable issue of fact with respect to whether Mr. Sullivan was responsible for paying Ms. White's salary, whether Mr. Sullivan was entitled to earn a commission on the Lyon Aircraft flights and on the dry leases, and what, if anything, Mr. Sullivan is now owed.  Consequently, I deny both motions for summary judgment on this question.

### 2.   The FLSA Claim

Mr. Sullivan contends that the Defendants, in failing to pay him the minimum wage in November and part of December of 2015, and from January 2016 until the end of his employment on February 16, 2016, violated the FLSA's requirement to pay wages in a timely manner.  The Defendants argue that the FLSA protections do not apply to Mr. Sullivan because he falls within the "outside salesman" exemption.  The Defendants also argue that they paid him in a timely fashion, consistent with the statute's requirements.

The FLSA requires that employers pay their employees a statutory minimum wage, subject to certain exemptions.  *See* 29 U.S.C. §§ 206, 213.  In particular, the statute exempts "outside salesm[e]n," "as such terms are defined and delimited . . . by regulations of the Secretary [of Labor]" from the purview of the

wage and hour requirements established by the Act.  29 U.S.C. § 213(a)(1).  In addition, courts have interpreted the FLSA to require that employers pay their employees promptly, though the term "prompt" has not been clearly defined by the courts of appeals.  *Compare Biggs* v. *Wilson*, 1 F.3d 1537, 1544 (9th Cir. 1993) (holding that the "failure to issue . . . paychecks promptly when due violates the FLSA" and that, under the FLSA wages were considered unpaid unless paid on an employee's regular pay day), *with Rogers* v. *City of Troy, N.Y.*, 148 F.3d 52, 55 (2d Cir. 1998) ("[A]lthough the FLSA does include a prompt payment requirement, that requirement is not violated when an employer changes its pay schedule . . .").

Here, Mr. Sullivan's claim that he was not paid in a timely fashion under the FLSA is factually identical to his claim under the Wage Act.  There is no doubt from the record that, at least with respect to the work Mr. Sullivan performed in January and February 2016, the Defendants failed to pay Mr. Sullivan "timely" in compliance with the FLSA.  Regardless of the definition of "timely," there is no dispute that Mr. Sullivan was never paid for that work.  Similarly, there is a genuine question of material fact as to whether Mr. Sullivan was fully and properly compensated for his work with Dumont in November and December 2015.  *See supra*.  The more pertinent question with respect to the FLSA claim is whether Mr. Sullivan's employment was subject to the FLSA at all.

Federal regulations[12] define an outside salesman as any employee "(1) [w]hose primary duty is: (i) making sales . . ., or (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and (2) [w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty."  29 C.F.R. § 541.500.  The term "primary duty" is further defined as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  To determine an employee's primary duty, I look at "all the facts . . . with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a). "[W]ork performed incidental to and in conjunction with the employee's own outside sales . . . shall be regarded as exempt outside sales work."  29 C.F.R. § 541.500(b).

The outside salesman exemption was designed "to address the incompatibility of wage and hour requirements with the individual character of the job performed by a salesperson who works without time restrictions and who can earn as much or as little as his ability and ambition dictate."  *Miranda-Albino* v.

---

[12]  Neither party has challenged the validity of these regulations.  Since the statutory framework of the Fair Labor Standards Act specifically allows the Secretary of Labor to promulgate regulations defining the scope of the outside salesman exception, these regulations are entitled to great deference.  *See Chevron U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *see also Hantz* v. *Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 618 (E.D. Va. 2014) (citing *Patel* v. *Napolitano*, 706 F.3d 370, 373 (4th Cir. 2013)).

*Ferrero, Inc.*, 455 F. Supp. 2d 66, 73 (D.P.R. 2006).  The exemption is to be "narrowly construed against the employers seeking to assert" it.  *Nielsen* v. *DeVry, Inc.*, 302 F. Supp. 2d 747, 752 (W.D. Mich. 2003) (citing *Arnold* v. *Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (196)).  "The exemption is premised on the belief that exempt employees 'typically earned salaries well above the minimum wage' and enjoyed other benefits that 'se[t] them apart from the nonexempt workers entitled to overtime pay.'"  *Christopher* v. *SmithKline Beecham Corp.*, 567 U.S. 142, 166 (2012).  It is the employer's burden to prove an employee's exempt status.  *Miranda-Albino*, 455 F. Supp. at 73.

In arguing that Mr. Sullivan should be considered an "outside salesman", the Defendants point to the fact that Mr. Sullivan worked from his own home in Massachusetts and only occasionally traveled to Dumont's offices in Delaware.  The Defendants also note that Mr. Sullivan took trips to numerous states in order to visit aircraft sales clients and for business conferences.  They also point to the fact that Mr. Sullivan spent a significant amount of his time proactively reaching out to prospective aircraft buyers and discussing aircraft sales opportunities.  Indeed, Mr. Sullivan expressly testified that "a large part of my job was looking through those e-mails and trying to find opportunities to sell our planes."

However, the regulation makes clear that "[o]utside sales does not include sales made by mail, telephone or the Internet unless such contact is used merely as an adjunct to personal

calls.  Thus, any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales is considered one of the employer's places of business." 29 C.F.R. § 541.502.  Indeed, an outside salesman is one "who makes sales at the *customer's* place of business or . . . at the *customer's* home."  29 C.F.R. § 541.502 (emphasis added). Therefore, Mr. Sullivan concludes, any work he did from his home office is nonexempt, in-house work.  Since the majority of his work took place at his home office, he argues, he cannot be considered an outside salesman.

In response, the Defendants contend that Mr. Sullivan cannot prove how much time he spent working in his home office and that Mr. Sullivan has admitted that he spent some amount of time traveling to other states to visit aircraft sales clients. However, the case law that the Defendants themselves cite makes clear that "the amount of time spent performing exempt sales work is useful, but not dispositive, in resolving an employee's 'primary duty.'"  *Hantz* v. *Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 619 (E.D. Va. 2014).  Moreover, it is not Mr. Sullivan's burden to show how much time he spent working from his home office; it is the Defendants' burden to establish that he is an outside salesman.

The Defendants also argue that Mr. Sullivan's home office work was "incidental to and in conjunction with the employee's own outside sales or solicitation."  *Nielsen*, 302 F. Supp 2d at 753.  Mr. Sullivan's home office work, they contend, supported

his sales conducted outside the office, and therefore the work performed in his home office does not make him an "inside" employee.  However, Defendants have provided no further evidence on the record to support this argument, and instead rely on their contention that Mr. Sullivan has not provided an estimate of how he divided his time.

Though it is ultimately a question of law whether Mr. Sullivan is an outside salesperson, how Mr. Sullivan spent his time working for the Defendants is a question of fact, and it is not one that I can resolve at this stage.  There is conflicting evidence regarding Mr. Sullivan's primary duties, and it is unclear how often, or how regularly, he traveled to sell aircrafts.

Consequently, I will deny motions for summary judgment with respect to the FLSA claim.

### 3.   Breach of Contract and Unjust Enrichment

Mr. Sullivan next moves for summary judgment on his breach of contract and unjust enrichment claims.  Both claims rely heavily on Mr. Sullivan's allegation that he is entitled to compensation for the Cook aircraft, the Selldorff aircraft, and the Saperstein aircraft.[13]  He also alleges that, under the

---

[13]  Mr. Sullivan also briefly argues that the Defendants' failure to pay him a minimum wage constituted a breach of contract, in addition to violating the Wage Act.  Mr. Sullivan did not move for summary judgment on this issue and, in any event, my consideration of the Wage Act claim makes clear that there are genuine issues of fact with respect to what Mr. Sullivan was owed under the Term Sheet.  Summary judgment on this basis will therefore be denied.

conditions of his employment, he was entitled to commissions on charter flights sold during his employment, regardless of when those flights took place.

The Defendants argue that both claims are preempted by the FLSA, and consequently, they are entitled to summary judgment then.   Defendants also argue that Mr. Sullivan was paid in accordance with any agreement existing between the parties and that there is no contractual agreement between the parties that entitles Mr. Sullivan to commissions in perpetuity.   In effect, the Defendants focus on what they call the "logically absurd" proposition that an employee who has terminated his employment could still hope to be paid by an employer once he is no longer working for that employer.

As a preliminary matter, I note that Defendants' position regarding the FLSA strikes me as disingenuous, especially since Defendants premised their opposition to Mr. Sullivan's claims under the FLSA on the proposition that he falls outside the scope of the statute.   Furthermore, at least a portion of Mr. Sullivan's claims for breach of contract and unjust enrichment are based on alleged agreements between the parties that were entered into before Mr. Sullivan was employed by Dumont, or on payments Mr. Sullivan believes should have been made after his employment was terminated, meaning they fall outside the scope of the FLSA.   *See supra* n. 6.   However, to the extent that Mr. Sullivan's claims are contingent on Dumont's failure to compensate him while he was an employee, they are preempted by

the FLSA.  *See Cosman* v. *Simon Roofing & Sheet Metal Corp.*, 2013 WL 2247498 at *2 (D. Mass. May 17, 2013).

Consequently, I will focus on the four bases Mr. Sullivan has articulated that fall outside the scope of his Wage Act and FLSA claims – the Cook sale, the Seldorff sale, the Saperstein sale, and any entitlement to post-termination commissions.

### a.   The Cook Aircraft Sale

First, Mr. Sullivan contends that the Defendants breached their contract with him by failing to pay him a 5% residual commission for charter flights on the Cook aircraft after January 1, 2016.  Because the contract between the parties with respect to the Cook aircraft was formed before Mr. Sullivan was formally employed by Dumont, Mr. Sullivan argues, he is entitled to residual commissions on the aircraft regardless of his status as an employee.[14]

Here, it is undisputed that, at the time Mr. Sullivan brokered the sale of the Cook plane, he was not employed by the Defendants.  It is also undisputed that the agreement relating to the Cook aircraft entitled Mr. Sullivan to a 5% commission

---

[14] Mr. Sullivan also suggests that the Defendants' failure to pay him this residual commission constitutes a violation of the Wage Act because the Defendants treated his commission payments as wages once they hired him.  However, during the May 2018 hearing, I expressed my skepticism about this argument, especially because the sale of the Cook aircraft took place before Mr. Sullivan was employed by Dumont.  Plaintiff's counsel ultimately conceded that the Cook aircraft falls outside the scope of the Wage Act, so I will consider the parties' arguments with respect to this aircraft only under a breach of contract theory.

and did not include any agreement as to a limit period for the charter payments.  Indeed, the Defendants have not pointed me to anything in the record that shows the parties contemplated a time limit on commissions for the Cook aircraft, despite my invitation to do so.  Instead, Defendants seem to rest their argument on the proposition that any agreement regarding the Cook aircraft was incorporated into the Term Sheet and that the agreement was ultimately terminated when Mr. Sullivan's employment was terminated.

However, there is no record evidence that the parties intended to incorporate the Cook aircraft agreement into the Term Sheet.  Though Dumont paid Mr. Sullivan's residual commissions as W-2 wages, the Term Sheet makes no mention of any prior agreements between Mr. Sullivan and the Defendants. Indeed, Defendants' counsel conceded during the hearing that the Cook transaction was separate from employment, and constituted a separate agreement.  Despite having the opportunity to do so, the Defendants have not presented me with any evidence to the contrary.[15]

Consequently, I find that the Defendants breached their contract with Mr. Sullivan with respect to the Cook aircraft and that Mr. Sullivan is entitled to unpaid commissions from the

---

[15] Defendants also do not argue that the agreement between the parties in February 2016 that neither side would owe the other money going forward would preclude liability with respect to the Cook aircraft.  I will therefore not delve into this argument here, since it is not properly before me.

Cook aircraft from January 1, 2016 to August 22, 2017, when the aircraft was decommissioned.

> b.   *The Selldorff Aircraft*

Mr. Sullivan next argues that he is entitled to compensation with respect to the Selldorff aircraft because he introduced Mr. Selldorff to the Defendants prior this is term of employment.  The Defendants respond that Mr. Sullivan never brokered a sale to Mr. Selldorff, meaning there was no contract between the parties and because the Defendants were not unjustly enriched.

It is undisputed that Mr. Sullivan brought Mr. Selldorff to Dumont, prior to his employment with the Defendants, to look at airplanes.  Eventually, on October 14, 2015, Mr. Selldorff purchased an aircraft from the Defendants.  The parties dispute whether Mr. Sullivan played a role in this sale, and whether Mr. Selldorff abandoned any working relationship with Mr. Sullivan and then approached the Defendants independently.  The Defendants claim that Mr. Sullivan was solely trying to sell a 957DP aircraft to Mr. Selldorff, and that Mr. Selldorff never purchased that aircraft.  Mr. Sullivan argues that he was involved throughout, and presented a variety of types of aircrafts to Mr. Selldorff, including the N947KK, which Mr. Selldorff eventually purchased.

To substantiate his claim, Mr. Sullivan argues that he and Dumont had a general agreement that Mr. Sullivan would be entitled to a portion of the aircraft purchase price if "[Mr.

Sullivan's] buyer makes the purchase."  However, the documents
Mr. Sullivan directs me to do not evidence such a broad
agreement.  Instead, the email exchange between Mr. Sullivan and
Mr. Wargo involve a specific aircraft that, ultimately, Mr.
Selldorff did not purchase.  Furthermore, though I specifically
requested it, Mr. Sullivan has not pointed me to anything in the
record to suggest that the Defendants had a general agreement
that would entitle Mr. Sullivan to $50,000 (or some other
commission) for introducing Mr. Selldorff as a potential
purchaser, so long as he purchased *something*.

Consequently, Mr. Sullivan has not provided evidence such
that a reasonable factfinder could conclude that a contract
existed between the parties that would entitle Mr. Sullivan to a
commission for the sale of the Selldorff aircraft.  Nor is there
anything in the record to show that the Defendants were unjustly
enriched or otherwise accepted or retained a benefit conferred
by Mr. Sullivan under circumstances that rendered this retention
inequitable.  *See, e.g.*, *Mass. Eye and Ear Infirmary* v. *QLT
Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009);
*Stevens* v. *Thacker*, 550 F. Supp. 2d 161, 165 (D. Mass. 2008).

I will therefore grant summary judgment to the Defendants
with respect to this claim.

> c.  *The Saperstein Aircraft*

Mr. Sullivan also argues that he is entitled to recover a
commission relating to the Saperstein aircraft under a theory of

unjust enrichment.[16]

A claim for unjust enrichment in Massachusetts requires that there be "unjust enrichment of one party and unjust detriment to another party." *Mass. Eye and Ear Infirmary* v. *QLT Photographics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009) (citation and internal quotation marks omitted). To prevail on a claim of unjust enrichment, a plaintiff must show: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make such acceptance or retention inequitable." *Stevens* v. *Thacker*, 550 F. Supp. 2d 161, 165 (D. Mass. 2008).

Here, Mr. Sullivan's claim for unjust enrichment fails as a matter of law. There was nothing inequitable in the contract entered into between the parties. Mr. Sullivan worked in sales on behalf of the Defendants. His contract provided that he would make commissions from actual sales of aircraft. While Mr. Sullivan could have bargained with the Defendants about what would happen to deposits when potential sales fell through, he apparently did not do that and the Term Sheet did not allow Mr. Sullivan to receive a sales commission when a sale did not

---

[16] Though Dumont tried to sell an aircraft to Mr. Saperstein during the period of Mr. Sullivan's employment, Mr. Sullivan does not dispute that the Term Sheet does not cover instances such as this one, in which no sale ever closed. Nor does he advance any argument that he is entitled to compensation for this sale under the Wage Act or the FLSA.

close.  In such circumstances, when there is a written agreement
between the parties, I will not "imply [another] contract where
there is an existing express contract covering the same subject
matter." *Zarum* v. *Brass Mill Materials Corp.*, 134 N.E.2d 141,
143 (Mass. 1956).

Accordingly, I will grant summary judgment to the
Defendants with respect to any claim made by Mr. Sullivan
concerning the Saperstein transaction.

### d.   Other Unpaid Commissions

Finally, Mr. Sullivan suggests that he is entitled to
commissions on the charter flights that were sold during his
employment, regardless of when the flights took place.  The
payment of these commissions would be governed by the Term
Sheet, which does not indicate that Mr. Sullivan is entitled to
payment in perpetuity.  However, the Term Sheet also does not
mention that Mr. Sullivan will no longer be entitled to
commissions if the employment relationship is terminated.

Neither party devotes much time to this argument, and any
payment owed to Mr. Sullivan would be covered both by the Wage
Act and by the FLSA.  Mr. Sullivan's claim for breach of
contract or unjust enrichment with respect to commissions earned
during the course of his employment are preempted by his
statutory claims.

I therefore will grant summary judgment to the Defendants
with respect to the breach of contract and unjust enrichment
theories for recovery as to these commissions.

### 4.   The Defendants' Counterclaims

Finally, the Defendants bring three counterclaims against Mr. Sullivan for breach of contract, unjust enrichment, and recovery of money paid under mistake of fact.  In effect, the Defendants contend that Mr. Sullivan failed to work diligently for them, unlawfully retained monies to which he was not entitled, and converted monies belonging to them by failing to turn over sales proceeds to the Defendants.  Though any money Mr. Sullivan improperly retained from a sale was ultimately turned over, the Defendants contend that they incurred costs and lost a charter customer because of Mr. Sullivan's actions.  The Defendants also allege that they made commission payments to Mr. Sullivan to which he was not entitled.

As a preliminary matter, the question whether the Defendants overpaid Mr. Sullivan is entirely dependent on the resolution of the Wage Act claims and the factual disputes concerning the scope of the term "gross flight charge revenue sales."  Consequently, a genuine issue of material fact with respect to that claim exists and cannot be resolved at this juncture.

With respect to the claims that Mr. Sullivan failed to work diligently and unlawfully retained money during the course of his employment, Mr. Sullivan argues that the Defendants have failed to assert a "cognizable" injury for these claims.  He also argues that the proper remedy for an underperforming

employee is termination or some other kind of disciplinary action, but not legal action.

To the extent that the Defendants' counterclaims are dependent on an allegation that Mr. Sullivan failed to work diligently, the Defendants do not have a cause of action. *See Awuah* v. *Coverall N. Am., Inc.*, 952 N.E.2d 890, 897 (Mass. 2011) ("If an employee's work is inadequate, [the employer] is free to implement sanctions, including termination; [the employer] is not free to withhold—much less recapture—the employee's earned wages."). While Dumont was certainly within its rights to terminate Mr. Sullivan's employment and may be entitled to seek a setoff for any concrete loss suffered, the Defendants cannot maintain a counterclaim premised on the basis that Mr. Sullivan did not perform his job.

However, the Defendants here have also alleged that they suffered identifiable damage as a result of Mr. Sullivan's actions during his period of employment. Although there was no formal allegation of theft, the Defendants allege, and Mr. Wargo testified, that Mr. Sullivan retained money owed to Dumont. The money was ultimately returned, but the Defendants allege that they incurred costs to uncover what they construe as a theft. However, the Defendants also concede that there is insufficient evidence to support the proposition that Mr. Sullivan stole funds from Dumont. Certainly the Defendants have not premised their counterclaims on an allegation of theft; nor have they made a clear argument about the basis of this claim.

Consequently, I do not view Defendants' counterclaims are distinct from the claims arising under the Wage Act and for breach of contract.  I will therefore grant summary judgment to Mr. Sullivan with respect to the Defendants' counterclaims, to the extent that these claims are different from, and independent of, the claims discussed above.

## V. THE DEFENDANTS' OBJECTION TO SANCTIONS

On September 12, 2017, Magistrate Judge Cabell issued an order granting Mr. Sullivan's motion for sanctions against the Defendants.  The Defendants timely objected to Judge Cabell's ruling, arguing that his order was clearly erroneous and should be vacated because the Defendants did not violate any court orders and were in the process of producing the documents that were the subject of Mr. Sullivan's earlier motion to compel.

I review the factual findings of a magistrate judge "under the 'clearly erroneous' rubric." *Phinney* v. *Wentworth Douglas Hosp.*, 199 F.3d 1, 4 (1st Cir. 1999) (citing 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a)).  Accordingly, I "must accept both the trier's findings of fact and the conclusions drawn therefrom unless, after scrutinizing the entire record," I "form a strong, unyielding belief that a mistake has been made." *Id.* (quoting *Cumpiano* v. *Banco Santander P.R.*, 902 F.2d 148, 152 (1st Cir. 1990)).

Under FED. R. CIV. P. 37(b)(2)(C), Judge Cabell necessarily made his decision regarding the necessity of imposing sanctions based on a finding that the Defendants had failed to comply with

the production orders he issued on May 26, 2017 and June 1,
2017.  However, Rule 37 "requires two things as conditions
precedent to engaging the gears of the rule's sanction
machinery: a court order must be in effect, and then must be
violated."  *Ortiz-Lopez* v. *Sociedad Espanola de Auxilio Mutuo Y*
*Beneficiencia de Puerto Rico*, 248 F.3d 29, 33 (1st Cir. 2001)
(quoting *R.W. International Co.* v. *Welch Foods, Inc.*, 937 F.2d
11, 15 (1st Cir. 1991)) (internal quotation marks omitted).

The Defendants assert that Judge Cabell's order imposing
sanctions is clearly erroneous because they did not violate a
specific court order, and, in fact, turned over all relevant
discovery before the court-imposed discovery deadline.  Based on
case law from the First Circuit and the record before me, I
agree; the Defendants violated no specific order of the court
even if they gave varied and conflicting responses as
explanations for the delayed production of documents.  Assuming,
as I do, Judge Cabell was correct that Mr. Sullivan's recourse
to a motion for sanctions was necessary, at least to effectuate
the production of the compelled discovery at issue, the decision
to impose sanctions was premature; the Defendants had already
started to turn over relevant documents and there was no
indication that they would otherwise fail to comply with Judge
Cabell's production orders.

Consequently, I will vacate Judge Cabell's order, [Dkt.
70], and deny Mr. Sullivan's motion for sanctions.

## VI. CONCLUSION

For the reasons outlined above, I GRANT IN PART and DENY IN PART the Defendants' motion [Dkt. No. 89] for summary judgment. I also GRANT IN PART and DENY IN PART the Plaintiff's motion [Dkt. No. 91] for summary judgment; I DENY the Plaintiff's motion [Dkt. No. 99] to strike.  Finally, I VACATE the Order entered by Magistrate Judge Cabell on September 12, 2017 [Dkt. No. 70] imposing sanctions after he allowed Mr. Sullivan's motion [Dkt. No. 64] for such relief.

The parties shall on or before April 12, 2019 submit a joint status report setting forth their views regarding remaining steps which should be taken to bring this case to final judgment in this court.  This case shall be set for a status conference at 2:15 p.m. on April 16, 2019, to consider the parties' status reports.


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE