UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JUSTIN B. SULLIVAN,            )
                              )
            Plaintiff,        )   CIVIL ACTION NO.
                              )   16-10713-DPW
v.                            )
                              )
DUMONT AIRCRAFT CHARTER, LLC, )
DUMONT AVIATION, LLC, and     )
KEVIN WARGO,                  )
                              )
            Defendants.       )

MEMORANDUM AND ORDER
September 29, 2023

TABLE OF CONTENTS

I. BACKGROUND ................................................ 3

II. DEFENDANTS' RULE 50(b) MOTION ........................... 5

  A. Legal Standard .......................................... 5

  B. The Contested Findings .................................. 6

    1. Dry Lease Flights ..................................... 7

    2. The Parties' Damages Stipulation .................... 12

III. PLAINTIFF'S PETITION FOR ATTORNEYS' FEES .............. 19

  A. In Calculating the Lodestar ............................ 22

  Certain Time Reductions are Appropriate ................... 22

  B. No Further Time Adjustments are Warranted .................

  Based Upon Purported "Lack of Success" by Mr. Sullivan ...... 29

  C. Reasonableness of Hourly Rates ......................... 34

    1. Mr. Sulman .......................................... 36

    2. Ms. Haas ............................................ 39

IV. PREJUDGMENT INTEREST .................................... 41

  A. Prejudgment Interest on Wage Act Damage Award ........... 42

  B. Prejudgment Interest on Contract Claims ................. 43

V. COSTS .................................................... 50

VI. COMPUTATION OF ATTORNEYS' FEES, COSTS ....................

AND PREJUDGMENT INTEREST AWARD .............................. 51

VII. CONCLUSION ............................................. 52

P

# I. BACKGROUND

Plaintiff Justin Sullivan worked as a salesman for Delaware-based Dumont Aviation, selling airplane charter services and arranging private sales of Dumont aircraft.  Mr. Sullivan's compensation consisted of commissions based on percentages of Dumont Aviation's revenues from charter flights and aircraft sales.

Mr. Sullivan sued Dumont affiliated entities and personnel[1] as defendants on April 13, 2016, alleging violations of the Massachusetts Wage Act and the federal Fair Labor Standards Act, breach of contract, and unjust enrichment.  He filed an amended complaint prior to a court ruling on a motion to dismiss.  The Dumont defendants filed counterclaims against him.  Before trial, Mr. Sullivan voluntarily dismissed claims against one of the two individual Dumont defendants, Daniel Piraino.  [Dkt. No. 86].

At the summary judgment stage, I dismissed portions of the breach of contract and unjust enrichment claims, to the extent that they pertained to transactions concerning particular

---

[1] The Dumont affiliated entities and personnel sued by Mr. Sullivan were Dumont Aviation Charter, LLC; Dumont Aviation, LLC; Kevin Wargo and Daniel Piraino.  A Stipulation of Dismissal was filed on January 12, 2018 as to Mr. Piraino.  The case has moved to final judgment with damages in Mr. Sullivan's favor to be entered jointly and severally among Dumont Aviation Charter, LLC; Dumont Aviation, LLC and Kevin Wargo.

aircraft.  Sullivan v. *Dumont Aircraft Charter,* LLC, 364 F.
Supp. 3d 63, 88-91 (D. Mass. 2019).  I also largely dismissed
Defendants' counterclaims.  Mr. Sullivan voluntarily abandoned
the FLSA claim when the case was presented to the jury.[2]

Following a four-day trial, the jury returned a verdict
largely in Mr. Sullivan's favor.  The jury found that Defendants
had improperly deducted certain expenses from Mr. Sullivan's
compensation and that the parties' compensation agreement
required Defendants to pay commissions for most categories of
charter flights operated by Dumont Aviation, regardless of
whether Mr. Sullivan had personally worked on selling those
flights.

The Dumont defendants have filed a motion [Dkt. No 171] for
directed verdict and judgment notwithstanding the verdict.

The parties have each filed proposed orders of judgment.
[Dkt. Nos. 170, 172].  Defendants have also filed a letter
outlining their arguments in opposition to assessing prejudgment
interest.  [Dkt. No. 172].

To resolve the final outstanding issues in this case before
final judgment is entered, Mr. Sullivan has submitted a petition

---

[2] The decision to abandon the FSLA claim is reflected in footnote
1 of the parties' Joint Stipulation on Damages attached to this
Memorandum as Exhibit B.  *See also* the court's colloquy with
counsel in connection with finalizing the verdict slip [Dkt. No.
163, Trial Tr. 3-4].

for attorneys' fees, supported by affidavits by his counsel, Mr. Joseph Sulman and Ms. Andrea Haas.  [Dkt. No. 169].  Mr. Sullivan has also filed a supplement to the attorneys' fees petition, identifying additional post-trial fees.  [Dkt. No. 177].

## II. DEFENDANTS' RULE 50(b) MOTION

With respect to the Dumont defendants' motion for Directed Verdict and Judgment Notwithstanding the Verdict [Dkt. No. 171], upon careful and extended review of the full record, I conclude Defendants have not surmounted the high burden of proving that no reasonable jury could have reached the verdict rendered in this case.[3]

### A.    *Legal Standard*

Even if some other jury, or I, could have decided differently than the jury in this case did, that possibility is not enough to support a directed verdict contrary to the decision entered by the jury that was empaneled to decide this case.  "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable

---

[3] I note Defendants have not perfected a request for a new trial, one of the forms of relief available to the court under FED. R. CIV P. 50(b)(1).  I observe further, after review of the record now before me, that nothing of record before me would appear to warrant a new trial for this case.

jury could have returned a verdict adverse to that party."
*Monteagudo v. Asociacion de Empleados del Estado Libre Asociado
de Puerto Rico*, 554 F.3d 164, 170 (1st Cir. 2009) (quoting
*Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d 162, 167
(1st Cir. 2005)).  That is not the state of the evidence
following trial in this case.

**B.    *The Contested Findings***

Defendants attack two of the jury's findings, which were
set forth on a special verdict slip.  [Dkt. No. 160].[4]

Defendants' first challenge is to the jury's finding that
"dry lease flights" were subject to the parties' employment
agreement.  Defendants' argument is essentially a reprise of
their summary judgment contention that, as a matter of law, the
parties' term sheet cannot be read to include dry lease flights.[5]
[Dkt. No. 90 p.19].

Defendants' second argument concerns the "Lyon Flights" and
pursues a different approach.  Rather than challenging the
jury's finding that "[f]lights booked by the Lyon's Sales Dept."
[Dkt. 160] were legally subject to the parties' employment

---

[4] A copy of the verdict slip is attached to this Memorandum as
Exhibit A.
[5] Dry lease flights occur where "one owner books a flight on
another owner's aircraft, and all instances of someone other
than the aircraft's owner flying on their own plane;" such
flight activity "is reported to aircraft owners as aircraft
revenue."  *Sullivan* v. *Dumont Aircraft Charter, LLC*, 364 F.
Supp. 3d 63, 75 (D. Mass. 2019).

agreement, Defendants contend that the parties' joint damages stipulation about the Lyon flights was somehow defective. Because of these claimed defects, and because Mr. Sullivan did not present evidence concerning the precise amounts of revenue attributable to the Lyon flights, Defendants argue there are insufficient findings of fact to support entry of judgment on the jury's verdict with respect to the Lyon flights claim.

### 1.   Dry Lease Flights

As detailed in my summary judgment Memorandum and Order, there was a genuine dispute of fact as to whether so-called "dry lease flights" fall within the scope of the parties' agreement regarding commissions owed to Mr. Sullivan. *Sullivan*, 364 F. Supp. 3d at 75.  The parties' positions, when they moved for Summary Judgment and at trial, were essentially mirror images. The parties dispute the legal significance of their term sheet, which provided that Mr. Sullivan would receive commissions on "gross flight charge revenues sales."  [*Id.*].

Mr. Sullivan contends that the broad language of the term sheet, by its use of the word "gross," encompassed all revenues for flight charges, regardless of source.  Defendants, by contrast point out that the dry lease flights were never discussed, were not expressly listed in the parties' term sheet, and were not part of Mr. Sullivan's sales efforts.  On this

basis Defendants argue that the dry lease flights were outside the scope of the parties' agreement.

I denied summary judgment and submitted the question to the jury because both parties' positions were plausible readings of the term sheet, which was itself ambiguous.  The evidence was sufficient to support a verdict for either party.

Yet Defendants' motion for directed verdict revives their summary judgment contention that theirs is the only valid interpretation of the term sheet.  For the same reasons that I rejected Defendants' motion for summary judgment on this point, their current motion also fails.  The term sheet does not contain any integration clause and is silent as to whether "gross flight charge revenues sales" includes "dry lease flights," or other categories of flights for that matter.  The written document was drafted by Defendants, so – as I instructed the jury – any ambiguities must be construed against them.

Because the term sheet is ambiguous as to which particular categories of flights were within the scope of the parties' agreement, the jury received extrinsic evidence, including Mr. Sullivan's testimony about his understanding of the terms of the agreement.

Mr. Sullivan's reading of the agreement is by no means implausible, and it is broadly consistent with Mr. Sullivan's testimony that, after a long meeting at Defendants' offices he

"felt like [he] had a deal . . . That [he] would receive 2.25 percent of all flight charges for all of Dumont's planes." [Dkt. No. 164 Trial Tr. 27:21-24].  Mr. Sullivan further testified that there was no discussion about excluding any category of flights from his commission base.  [*Id*. 21:14-18].

Mr. Sullivan's testimony reasonably supported his contention that he had agreed to work with Defendants on the understanding that he would be compensated based on all of Defendants' flights – whether Mr. Sullivan himself had booked them or not.  In his telling, the parties discussed two possible compensation models: one which would have provided a higher base commission (dubbed "eat-what-you-kill"), the other which would incentivize Mr. Sullivan to maximize Defendants' business on multiple fronts (dubbed "leading the charge").  [*Id.* Trial Tr. 29:16-30:4].  A contemporaneous email exchange between Mr. Sullivan and an individual Dumont defendant, Kevin Wargo, bolstered Mr. Sullivan's narrative in that it explicitly contrasted the "I eat what I kill" and "I lead the charge" approaches.  [*Id.*].  Mr. Sullivan's testimony included the following:

Q.  After the email exchange that we just looked at in Exhibit 3, what was your understanding of flights that you would be receiving commission on?

A.  I would be receiving commission on all flight charges, all the planes.

Q.   And did that depend on whether or not you booked those flights?

A.   No. Eat what you kill or lead the charge. And we did not do eat what you kill.

[*Id.* at 34:6-14].

At trial, in cross-examining Mr. Sullivan, Defendants extracted an acknowledgment that dry lease flights were not something that the parties specifically discussed, or even "contemplated":

Q.   Now, as it pertains to the employment agreement, Exhibit 4, Mr. Sullivan, the term dry lease flights does not show up anywhere in the document, correct?

A.   Correct.

Q.   Okay. And isn't it true that you never even mentioned or talked about dry leases with Kevin prior to signing the agreement?

A.   That's correct.

Q.   Okay. And it wasn't even contemplated between you and Kevin, correct?

A.   That's correct.

Q.   Okay. And you never even asked for the term "dry lease" to be included in the agreement, correct?

A.   That's correct.

[Dkt. No. 165 at 26:5-18].

In the parties' respective views of their agreement, Mr. Sullivan's acknowledgements of the cross-examiners' assertions take on diametrically opposed meanings.  For Defendants, the failure explicitly to include dry lease flights should end the

10

matter.  Mr. Sullivan, by contrast, explains that the lack of
any particularized mention of dry lease flights means nothing
because there was no enumeration of *any* particular categories of
flights to be included in the agreement.  There was no need to
list particular categories of flights, Mr. Sullivan contends,
because the parties' agreement was that Plaintiff would earn
commissions on *all* flights.

   While Defendants' interpretation is also not implausible,
there was ample evidence to support Mr. Sullivan's viewpoint,
including Mr. Sullivan's own testimony, as corroborated in part
by contemporaneous emails.

   In their motion for judgment notwithstanding the verdict,
Defendants make much of a passing remark I made regarding the
challenge of discerning an agreement in the absence of evidence
that either party specifically "contemplated" dry lease flights.
[*Id.* at 110:18-111:6].  I find and conclude, however, there is
no impediment to accepting the jury's verdict.  Whether or not
the parties gave conscious thought to dry lease flights in
particular, the evidence permitted the jury to find that the
parties' agreement to compute commissions based on gross flight
revenues encompassed "all flight charges."

   The key issue is not whether the parties themselves had an
affirmative understanding that their agreement would include dry
lease flights in particular.  The point is that the parties

11

entered into a contract and Defendants provided Mr. Sullivan
with a written memorialization of their agreement, which used
the words "gross flight charge revenues sales."  Mr. Sullivan
could reasonably have understood — from the parties' discussions
and from the term sheet's subsequent reference to "gross flight
charge revenues sales" — that his compensation would be based on
all flights, even if he was not specifically aware of every type
of flight from which Defendants received revenue.  Mr. Sullivan
testified that this was his understanding and the jury's finding
comports with that testimony.

There was, in short, more than sufficient evidence to
support the jury's verdict that Plaintiff was entitled to
commissions on dry lease flights.

### 2.   The Parties' Damages Stipulation

Defendants' second attack on the verdict is a brazen
attempt to renege on their own stipulation with Mr. Sullivan and
on their representations to the court about the issues to be
tried in this case.  The parties entered into a written
stipulation which specified the amount of damages that would be
associated with each of the categories of liability to be
submitted to the jury.  [Dkt. No. 124].[6]  In particular,
stipulations 4 through 8 corresponded to categories A through E

---

[6] The Stipulation is attached to this Memorandum as Exhibit B.

of question 2 on the verdict slip.  [*Compare* Dkt. No. 124, *with* Docket No. 160].

Defendants' counsel understood and represented to me that, in so stipulating, Defendants were agreeing to the dollar amounts of the damages that would be awarded in connection with any liability findings by the jury on the various categories of sales for which Plaintiff claimed commissions:

> MR. HUNT: . . . We have a consensus on most, if not all, of the dollar amounts in question which would be submitted to a jury.
>
> THE COURT: Why would it be submitted to the jury if it's agreed upon? Why wouldn't I use that as a form of summary judgment with respect to whatever it is that you agreed upon?
>
> MR. HUNT: Let me backtrack. It would be, as to the liability questions that are going to be submitted to the jury, we have consensus on different components of damages. We have a consensus on what those damages would be.
>
> THE COURT: Okay. So if there is a liability finding with respect to certain elements of this, then we're going to have an agreement, stipulation, by the parties that if there's liability on the part of the defendant, this is what the damage would be?
>
> MR. HUNT: That's correct.
>
> THE COURT: That's a stipulation. Doesn't have to be presented to the jury?
>
> MR. HUNT: I would agree.

[Dkt. No. 142 Trial Tr. 5:9-6:1].

Defendants also now seek to undo the jury's verdict with respect to another category of damages, commissions on aircraft

13

chartered by the Lyon group.  In this effort, Defendants make much of the fact that the wording of item 2A on the verdict slip does not perfectly match the corresponding language in the parties' stipulation.  The verdict slip refers to "Flights booked by the Lyon's Sales Dept," while the stipulation refers to "Lyon Flight Charges" (followed by an itemization of flights sold during two distinct time periods).

Defendants contend that this disjunction creates an open factual dispute, and they further contend that Plaintiff somehow neglected to introduce evidence to address the point:

> The parties therefore agreed only on the gross aggregate revenue (detailed above) without differentiating between flights booked on Lyon aircraft by Lyon's sales department and flights booked on Lyon aircraft by Dumont's sales department. In the face of that disagreement, Plaintiff was required to present evidence to prove these amounts at trial. He failed to do so.

> Indeed, during Plaintiff's testimony, he did not once explain or try to explain how to calculate his alleged commission for flights booked by the Lyon Sales Department, and he did not review or explain the Joint Stipulation on Damages during his testimony.

[Dkt. No. 171 p.6].

In the face of the waiver protocols of FED. R. CIV. P. 49(a)(3), and forfeiture protocols of FED. R. CIV. P. 51(c)(1), Defendants' argument tests the boundaries of good faith. Defendants' counsel stipulated to the pertinent damage amounts and expressly agreed with the court — in previewing the time that would be needed for trial — that damage amounts would be

stipulated so that no trial time need be devoted to "the

numbers":

> MR. HUNT: . . . he is the numbers guy, so it could take
> a little bit longer.
>
> THE COURT: Why would it take that? We're just talking
> about the question of liability. The numbers are all
> going to be resolved.
>
> MR. HUNT: No. That's true, Your Honor. I take that back.
> You're right.

[Dkt No. 142 Trial Tr. 15:4-10].

In arguing that there was a deficiency in Mr. Sullivan's

proof at trial, Defendants avoid engaging with the fact that the

wording difference they seek to exploit was the product of a

pre-charge conference during which Defendants themselves urged

the court to revise the wording of the verdict slip.  Indeed,

the particular wording that was ultimately used in the verdict

slip was proposed by Defendants' counsel.  [Dkt No. 166 Trial

Tr. 13:23-14:3].  Defendants' evident purpose was to make clear

to the jury that Mr. Sullivan was claiming commissions for

flights that had been booked by the Lyon sales department, for

which he had not already been paid.  [*Id.* at 11-14].

During the charge conference, I expressly noted the

potential for a discrepancy between the wording of the verdict

slip and the stipulation, but acceded to the parties' request to

adjust the language of the verdict slip.  [*Id.* at 3:5-10] ("One

of the perplexing things to me was the language about Lyon

15

flight charges.  One of the reasons that I clung to it as long as I did is that it's the language that's used in the joint stipulations on damages which ties back into it.  But I understand the refinement the parties would like to have for it.").  Having requested the very words that I adopted, Defendants cannot supportably suggest — after the fact — that they were entitled to something different.

In moving for judgment notwithstanding the verdict, Defendants recite a litany of questions that were not submitted to the jury:

> And the jury was not asked to decide whether Dumont was obligated to pay Plaintiff a commission even though Dumont itself earned no revenue or commission from Lyon-booked flights during that period.  Nor was the jury asked to decide whether the language in the Term Sheet required Dumont to pay Plaintiff a commission based on all revenue Lyon generated from Lyon-booked flights (*e.g.* including pass-through charges paid by customers such as those for fuel, staff, etc.) or only on the commission or net revenue such flights generated to Lyon.

[Dkt. No. 171 at 5].

Glaringly absent from Defendants' motion is any suggestion that Defendants ever requested that these questions be put to the jury.  Defendants did nothing of the kind.  On the contrary, I noted that some adjustments in the parties' stipulation would be needed to credit payments that Mr. Sullivan had already received, and Defendants' counsel agreed.  [Dkt. No. 166 at 8-12].  Defendants acknowledged that this was a straightforward

16

matter of computation, not a factual dispute to be resolved by
the jury.  [*Id.* at 11:25-12:1] ("THE COURT: But couldn't that be
worked out?  MR. MARTIN: Absolutely.").

As for putting such computational questions to the jury,
Defendants' counsel explicitly acknowledged that the factual
dispute to be resolved was the one set forth on the verdict
slip.  [*Id.* at 12:15-17] ("We all agree that he was paid on the
Dumont-booked flights on Lyon aircraft.  You just need to decide
whether he should be paid on the flights booked by Lyon.").

In short, Defendants agreed to proceed by stipulation on
the damages issue and did not lodge any pertinent or timely
objection to the form of the special verdict slip or to the
court's instructions of law to the jury.  [Dkt. No. 167 at 3-4]
(unrelated objection to verdict form), [*id*. p.46] (unrelated
objection to jury instruction).

Defendants now seek to exploit a self-created quibble with
the wording of the stipulation and verdict slip and, on that
basis, they suggest that an entirely different set of questions
should have been put to the jury.  The law, however, does not
permit a party to begin with one kind of trial (and stipulate to
facts that need not be submitted to the jury) and then, when the
outcome is not to their liking, come back and demand a wholly
different kind of trial.  *Cf. Meschino v. N. Am. Drager, Inc.*,
841 F.2d 429, 435 (1st Cir. 1988) (overturning directed verdict

17

that had been granted based upon defendant's contention that
plaintiff's proof was inadequate on certain points, noting that
admissions and pretrial submissions had obviated the need for
evidence on those points).

Defendants' failure to object as required by FED. R. CIV. P.
51(c)(1) forfeits any claim that different or additional
questions should have been put to the jury, or that Plaintiff
should bear some additional burden of proof. *Cf. Booker v.
Mass. Dep't of Pub. Health*, 612 F.3d 34, 41 (1st Cir. 2010)
("Failure to comply with the rule ordinarily results in
forfeiture of 'the objection to which the failure
relates'. . . .") (citing FED. R. CIV. P. 51(d)(2)). Indeed, I
expressly warned the parties of the need for timely, explicit
objections. [Dkt. No. 166 pp.4-5]. Given that Defendants' own
counsel proposed the wording of the particular line of the
verdict slip to which Defendants now take exception, any
objection was abandoned entirely.

It is too late in the day for Defendants to spring a newly
hatched objection on their adversary, or on the court.
Defendants point to no meaningful dispute about the terms of the
parties' stipulation or its effect on the amounts of damages to
be awarded. Far from raising any genuine factual dispute –
which would, in any event, have been a matter to raise *before*
trial, not afterwards – Defendants offer belated technical

18

arguments in hopes of undoing the jury's work.  This is extreme
and unworthy gamesmanship.

Defendants' after-the-fact attempt to disavow the
stipulations that framed the jury trial is foreclosed by the
Federal Rules of Civil Procedure, which require that parties
preserve and timely interpose their objections.  Defendants did
not do so here.

### III. PLAINTIFF'S PETITION FOR ATTORNEYS' FEES

Mr. Sullivan contends that he is entitled to reasonable
attorneys' fees for his successful Wage Act action.  The
Massachusetts Wage Act provides that an "employee so aggrieved
who prevails in such an action shall be awarded treble damages,
as liquidated damages, for any lost wages and other benefits and
shall also be awarded the costs of the litigation and reasonable
attorneys' fees."  MASS. GEN. LAWS ch. 149, § 150.

To determine a reasonable fee award, courts in these
circumstances typically use the "lodestar method."  Under this
method, the court calculates "the number of hours reasonably
expended on the litigation multiplied by a reasonable hourly
rate."  *Hensley* v. *Eckerhart*, 461 U.S. 424, 433 (1983).  More
specifically, the court takes "the time counsel spent on the
case, subtracts duplicative, unproductive, or excessive hours,
and then applies prevailing rates in the community (taking into
account the qualifications, experience, and specialized

19

competence of the attorneys involved).” *Gay Officers Action League* v. *Puerto Rico*, 247 F.3d 288, 295 (1st Cir. 2001).

After making this initial calculation, the court may exercise discretion to “adjust the lodestar itself, upwards or downwards” based on a variety of factors, “including the results obtained and the time and labor actually required for the efficacious handling of the matter.” *Torres-Rivera* v. *O'Neill-Cancel*, 524 F.3d 331, 336 (1st Cir. 2008) (citing *Hensley*, 461 U.S. at 430 n.3).

Although I do not view the Massachusetts state law and the federal law regarding attorneys' fees as materially different, now that the only federal claim — the FLSA claim — has been dismissed, this case continues only under diversity jurisdiction.

Consequently, I look to Massachusetts law to determine the appropriate means of calculating reasonable attorneys' fees. *See Sorenson* v. *H & R Block, Inc.*, No. CIV.A. 99-10268-DPW, 2005 WL 2323196, at *3 (D. Mass. Sept. 1, 2005) (“Where, as here, the court exercised diversity jurisdiction, state law controls.”).

The Massachusetts Supreme Judicial Court has observed that “[a] fair market rate for time reasonably spent preparing and litigating a case is the basic measure of a reasonable attorney's fee under State law as well as Federal law.” *Fontaine* v. *Ebtec Corp.*, 613 N.E.2d 881, 891 (Mass. 1993)

20

(describing calculation of attorneys' fees in age discrimination matter); *see also Joyce* v. *Town of Dennis*, 720 F.3d 12, 26 (1st Cir. 2013) ("The Massachusetts Supreme Judicial Court . . . has adopted the 'lodestar' method commonly used by federal courts . . . ."); *Adams* v. *Zimmerman*, 73 F.3d 1164, 1177 (1st Cir. 1996) that "[t]he lodestar approach to calculation of attorneys' fees is a recognized method of computation").[7]

---

[7] The Appeals Court of Massachusetts has further clarified its understanding of the SJC's guidance in *Fontaine* v. *Ebtec Corp.*, 613 N.E.2d 881 (Mass. 1993), explaining that "*Fontaine* does not require use of the lodestar approach; rather, it states that such an approach may be advantageous." *WHTR Real Est. Ltd. P'ship* v. *Venture Distrib., Inc.*, 825 N.E.2d 105, 111 (Mass. App. Ct. 2005). In other circumstances where Massachusetts law provides for "reasonable attorney's fees," the First Circuit has determined that "there is no 'pat formula' for computing a fee award." *Star Fin. Servs., Inc.* v. *AASTAR Mortg. Corp.*, 89 F.3d 5, 16 (1st Cir. 1996) (Stahl, J.) (citation omitted). Rather, "the amount awarded should be determined by what the 'services were objectively worth.'" *Id.* (citation omitted). That calculation "is largely discretionary," however. The SJC has outlined the following factors for consideration: "the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases." *Linthicum* v. *Archambault*, 398 N.E.2d 482, 488 (Mass. 1979), *abrogated by Knapp Shoes, Inc.* v. *Sylvania Shoe Mfg. Corp.*, 640 N.E.2d 1101 (Mass. 1994). Regardless, as the Appeals Court of Massachusetts has explained, the lodestar calculation brings the *Linthicum* factors "into play indirectly." *Siegel* v. *Berkshire Life Ins. Co.*, 835 N.E.2d 288, 294 n.8 (Mass. App. Ct. 2005) (Cohen, J.). "For example, the complexity of the case is likely to be reflected in the judge's finding as to the amount of time reasonably spent on the matter, and the ability and reputation of the attorney are likely to be reflected in the judge's finding as to a reasonable hourly rate." *Id.*

I use the lodestar calculation as a "starting point" in this matter, *Coutin*, 124 F.3d at 337, first, "calculat[ing] the time counsel spent on the case, subtract[ing] duplicative, unproductive, or excessive hours," *Gay Officers Action League* v. *Puerto Rico*, 247 F.3d 288, 295 (1st Cir. 2001) (Selya, J.), and then "identify[ing] 'a reasonable hourly rate or rates — a determination that is often benchmarked to the prevailing rates in the community for lawyers of like qualifications, experience, and competence,'" *Pérez-Sosa* v. *Garland*, 22 F.4th 312, 321 (1st Cir. 2022)(quoting *Cent. Pension Fund of the Int'l Union of Operating Eng'rs & Participating Emps.* v. *Ray Haluch Gravel Co.*, 745 F.3d 1, 5 (1st Cir. 2014)).  Following the initial calculation, I then have a basis to "adjust the lodestar itself, upwards or downwards, based on any of several different factors, including the results obtained and the time and labor actually required for the efficacious handling of the matter."  *Torres-Rivera* v. *O'Neill-Cancel*, 524 F.3d 331, 336 (1st Cir. 2008) (Selya, J.).

**A.   *In Calculating the Lodestar Certain Time Reductions are Appropriate***

Mr. Sulman has submitted roughly three-and-a-half years of billing records: March 2, 2016 through August 6, 2019 [Dkt. No. 169-1], totaling 390.4 hours, and August 9, 2019 through

September 5, 2019 [Dkt. No. 177-1], totaling 14.9 hours.  The gross total for Mr. Sulman is 405.3 hours.

Ms. Haas has submitted just under three years of billing records: December 14, 2016 through August 7, 2019 [Dkt. No. 169-1], totaling 458.3 hours, and August 19, 2019 through September 6, 2019 [Dkt. No. 177-1], totaling 5.1 hours.  The gross total for Ms. Haas is 463.4 hours.

Plaintiff has not included hours billed by associate attorneys Elijah Bresley and David Brody, which total 2.8 hours. Neither shall I.

From the figures submitted by Plaintiff, I will reduce the hours listed in the original fee petition for four reasons:[8] to remove time spent on issues other than the Wage Act; to remove time billed for duplicative discovery efforts; to remove excessive trial preparation hours; and to discount hours that are recorded as block billing.

I will also reduce the lodestar billing rates for Mr. Sulman and Ms. Haas, applying moderately lower "blended" rates, to account for the fact that each of them billed for tasks that

---

[8] I have not reduced the hours listed in Plaintiff's supplemental fee petition, which reflects attorney hours that were dedicated to responding to Defendants' post-trial motion for directed verdict.  Defendants have filed no opposition, and the reasons for reducing hours in the original fee petition do not apply to the supplemental petition.

did not require the skill and expertise of such experienced
attorneys.[9]

Taking the reductions of hours in turn:

First, Defendants persuasively argue that certain motions
filed by Plaintiff were solely related to pre- and post-
employment flights, which are not included in the Wage Act claim
and therefore are not subject to an attorneys' fees award.
Under the American Rule, a prevailing party is not entitled to
attorneys' fees absent a statutory or contractual hook, which in
this case is the Wage Act claim.  *See Wong v. Luu*, 472 Mass.
208, 215 (2015).  Commissions owing from flights that occurred
before or after Plaintiff's employment with Dumont Aviation are
not subject to the Wage Act.

---

[9] As I have discussed elsewhere, some of my colleagues in the
District of Massachusetts further refine the lodestar
calculation, dividing an attorney's work into "core" legal work
and "non-core" administrative work and then "billing non-core
work at two-thirds the reasonable hourly rate charged for the
core work of that attorney."  *Porter v. Cabral*, No. CIVA 04-
11935-DPW, 2007 WL 602605, at *12 n.13 (D. Mass. Feb. 21, 2007),
*aff'd sub nom. Cabral v. U.S. Dep't of Justice*, 587 F.3d 13 (1st
Cir. 2009).  In contrast, it is my practice to apply a single,
blended rate, "which takes the variety of lawyers' tasks into
account . . . [and] more closely mirrors the usual billing
practices of law firms without introducing artificial
distinctions among the various activities attorneys perform."
*Id.*  I have noted that Ms. Haas, particularly, applied her full-
billing rate to distinctly clerical tasks such as filing, court
scheduling, and making phone calls not related to legal advice.
[Dkt. No. 169-1 pp.39-62].

In particular, Defendants identify several billing record entries that solely relate to Cook flights that were subject to a contractual arrangement outside the scope of the employment agreement.  Defendants point to work on a supplemental motion to compel [Dkt. No. 56] and an opposition to Defendants' motion for reconsideration on summary judgment [Dkt. No. 121].  Ms. Haas spent 12.3 hours preparing the supplemental motion to compel. [Dkt. No. 169-1 pp.43-44].  As to the opposition brief, Ms. Haas spent 1.5 hours and Mr. Sulman spent 4.7 hours.  [Dkt. No. 169-1 pp.43, 68-69].  Defendants also identify 8.4 hours spent by Ms. Haas that solely concern the Selldorff flight claims, which were dismissed on summary judgment.  [Dkt. No. 176 p.12 n.2].  These hours should be deducted from the fee award because they were dedicated solely to pre- and post-employment flights, and thus do not arise under the Wage Act.  On this basis, Ms. Haas' fees will be reduced by 22.2 hours and Mr. Sulman's fees by 4.7 hours.

In this connection, Defendants argue that the award of attorneys' fees should be further reduced for hours spent on what might be characterized as dual use motions that concerned pre — and post — employment flights, even if those motions also concerned Wage Act claims.  For example, Defendants identify hours spent on a motion to compel [Dkt. No. 40] which led to an order to produce Cook flight documents [Dkt. No. 57].  By

Defendants' own admission, however, the motion to compel also led to the production of documents relevant to employment matters.  [Dkt. No. 176 p.13] ("In addition to seeking production of the Cook invoices, Plaintiff also sought to compel the Defendants: . . . (iv) to produce owner statements for the period of Plaintiff's employment – which relief was granted.").

I am not persuaded that there is a fair method for delineating between hours spent on Wage Act claims and other claims with exquisite precision when both categories were addressed in the same motion.  Attorneys are not expected to bill separately for different legal issues they address within the same motion, and Defendants point to no authority supporting such a practice.  Any attempt to intrude on an attorney's allocation of mental faculties would be entirely speculative.  Accordingly, I will not reduce hours spent on motions that concerned both Wage Act claims and pre — and post — employment flight-related claims in the context of dual use work.

Second, Mr. Sulman's hours for duplicative work must be reduced.  In his affidavit, Mr. Sulman stated that he spent 37.8 hours on discovery practice, "which was primarily oversight of Ms. Haas's work."  [Dkt. No. 169-1 p.6].  Defendants persuasively argue that, given Ms. Haas' ten years of legal experience, it is unreasonable for Mr. Sulman to dedicate such substantial amounts of time to "oversight" of an experienced

26

lawyer.  [Dkt. No. 176 p.15].  The bulk of this time (80%, or 30.2 hours) will be deducted from the total as duplicative.

Third, it appears an excessive amount of time was spent in preparation for trial.  Defendants observe that "Plaintiff's attorneys billed 294.5 hours for trial preparation (the equivalent of nearly two months at 40 hours per week), for a trial that had only three witnesses and spanned four half-days." [Dkt. No. 176 p.16].  In this connection, Plaintiff's counsel identifies 180.1 hours spent on trial preparation by Mr. Sulman and 114.4 hours by Ms. Haas.  [Dkt. No. 169-1 p.5].

I am loath to treat hours actually spent on trial preparation as time inefficiently spent.  Moreover, Mr. Sullivan, after all, achieved a near-total victory at trial. Nonetheless, the brief duration of the trial casts the high number of preparation hours into sharp and unflattering relief. While it is impossible to calculate precisely the number of hours that should have been spent, I find and conclude it is fair to treat 10% of the reported trial preparation hours as excessive.  On this basis, I deduct 18 hours from Mr. Sulman's total and 11.4 hours from Ms. Haas's.

Fourth, certain of Mr. Sulman's hours based on his use of block billing bear reduction.  Block billing makes it difficult to know how much time he spent on individual tasks, which in turn makes it difficult to know whether the amount of time he

spent on a given task was reasonable.  For example, Defendants point out that Mr. Sulman's billing entries include approximately 58 hours "for drafting, revising, and practicing his opening statement."  [Dkt. No. 176 p.17].  Because Mr. Sulman employed block-billing, it is impossible to know how much time was apportioned to the opening statement as opposed to other trial preparation tasks identified in the entries, such as drafting motions in limine and witness preparation.  [Dkt. No. 169-1 pp.70-71].  A modest reduction for the use of block-billing is a reasonable means to adjust for this deficiency. *See Torres-Rivera*, 524 F.3d at 339-40 (affirming district judge's reduction of fee by 15% due to block billing).  A 5% reduction is sufficient, in this case, because Mr. Sulman's block-billing was, for the most part, confined to relatively short periods (leaving aside full-day periods during the trial).

My reductions of the claimed attorneys' hours are broadly consonant with Mr. Sullivan's offer to apply a 10% across-the-board reduction in his aggregate attorneys' fees request.  In Mr. Sullivan's words, that proposal was intended to cover "the few claims that were unsuccessful, any clear overlap in work between the Wage Act claim and the successful breach of contract claim, and any duplication of work or administrative tasks that may not have been accounted for in the time entries."  [Dkt. No.

169 p.10].  The result I reach is not far from Mr. Sullivan's proposed resolution, although my rationale, of course, differs.

**B.    *No Further Time Adjustments are Warranted Based Upon Purported "Lack of Success" by Mr. Sullivan***

Defendants also seek a reduction of the lodestar based on Plaintiff's unsuccessful claims (*i.e.*, claims raised in the complaint that were ultimately dismissed) and based on Plaintiff's purported "lack of success" on the Wage Act claims.

As the First Circuit observed in *Coutin v. Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 338 (1st Cir. 1997), the trial court has discretion to reduce the lodestar figure in consideration of the "results obtained" in a suit.  *Coutin* instructs:

> [T]he term "results obtained" has a variety of meanings. It can refer to a plaintiff's success claim by claim, or to the relief actually achieved, or to the societal importance of the right which has been vindicated, or to all of these measures in combination. We think that the last meaning is the best choice, and that, as a consequence, all three types of "results" potentially bear upon the amount of an ensuing fee award.

124 F.3d at 338.

The results obtained by Mr. Sullivan in this case cannot fairly be characterized as showing any "lack of success," particularly when the guidance outlined in *Coutin* is carefully considered.

Defendants' best argument would focus on a claim-by-claim analysis, since it is true that certain claims were dismissed in

full (the FLSA claim and the emotional distress claim) and
certain discrete factual components were dismissed (the
Saperstein and Selldorff transactions, the owner flights).  But
the overall result in this case was very much in Mr. Sullivan's
favor.  Moreover, a claim-by-claim analysis is inapt here.  The
FLSA claim, for instance, was essentially conterminous with the
Wage Act claim, on which Plaintiff has prevailed.  A mechanical
tallying of the numbers of successful and unsuccessful claims
says little about the course and conduct of this litigation.  At
summary judgment, and with the jury verdict, Plaintiff was
overwhelmingly the prevailing party.

As for the relief that Plaintiff actually obtained,
Defendants miss the mark when they argue that the monetary
relief stemming from the Wage Act claims was minimal. Whether
measured in gross dollars or in comparison with the Cook flight
commissions, the Wage Act award was in fact substantial.  Of the
$508,280.24 of damages to be awarded in this case, the greater
share, $322,131.12, is based on Plaintiff's Wage Act claim.  The
remainder, $186,149.12, rests on a breach of contract claim
arising from unpaid commissions for pre- and post-employment
charter flights (the "Cook Flights").

In denigrating Plaintiff's success, Defendants ignore that
the commissions associated with the Wage Act claims are subject

to trebling as liquidated damages — greatly increasing the amount of damages relief to be awarded.  The $47,190 figure identified by Defendants translates into a damages award of $141,300.  Moreover, Defendants' computation omits the Lyon sales commissions, effectively relying on their unsuccessful argument mounted in the motion for directed verdict.  I did not credit that argument, and the Lyon sales commissions add $60,186.64 to the Wage Act claims.  The Wage Act claims, in short, amount to $322,131.12 of monetary relief.  This is no trivial sum.

Defendants argue that because the Cook flight commissions made up such a large portion of the overall monetary award, the lodestar for the Wage Act claims should be reduced concomitantly.  The logic of this suggestion is not obvious. With or without the other claims, an award of $322,131.12 on the Wage Act claims is substantial, fully justifying an award of attorneys' fees.

While I have deducted hours that were dedicated exclusively to contract claims outside the employment period, an important consideration in weighing the attorneys' fees award in this case is that the breach of contract claims and the Wage Act claims were closely intertwined.  Both sets of claims turned on a close examination of the employment relationship, the parties' representations and agreements, and the sales figures for Dumont

31

Aviation's various revenue streams.  Because Plaintiff's entire compensation was composed of sales commissions, the core factual dispute – which governed all of Plaintiff's claims – lay in the parties' differing accounts of their business arrangement.

As discussed above, the trial was largely a contest about whether the parties had entered into a "lead-the-charge" compensation model, as Mr. Sullivan testified, or something more akin to the "eat-what-you-kill" model.  The timing of particular sales determined whether they were compensable under the Wage Act,[10] but determining precisely *when* particular sales took place was an ancillary issue as to which there was little material dispute.  Indeed, the verdict slip did not require the jury to make any special findings about the dates of the sales that generated commissions.

Because all the claims were based on a common core of facts, that is, the characterization of the parties' business relationship, it does not make sense to reduce the lodestar. Even if all the claims had been brought only under the Wage Act, Mr. Sullivan plainly would have mounted essentially the same case at trial.  *Cf. Phetosomphone v. Allison Reed Grp., Inc.*, 984 F.2d 4, 7 (1st Cir. 1993) ("[A] district court may find that

---

[10] As noted above, commissions that accrued during Plaintiff's employment term were subject to the Wage Act, while other commissions were governed by contract law.

the federal and state claims are so interrelated, and the time spent in preparation of those claims so overlapping, that an attempt to separate the time attributable to one or the other would be futile.").

Defendants do not point to any public policy reasons to reduce the lodestar based on "societal importance."  Indeed, the policy rationale for awarding attorneys' fees under the Wage Act is well established.  *See, e.g.*, *George,* 477 Mass. at 373 ("The Wage Act was enacted 'to protect wage earners from the long-term detention of wages by unscrupulous employers.'" (quoting *Melia v. Zenhire, Inc.*, 462 Mass. 164, 170 (2012)).

In sum, none of the "results obtained" factors outlined by the First Circuit in *Coutin*, considered individually or together, encourage me to reduce the claimed number of attorney hours in this case further (leaving aside my application of a "blended rate" discussed *supra* note 6).  On the contrary, these factors suggest that an attorneys' fee award in the full lodestar amount is appropriate; Mr. Sullivan achieved a nearly complete victory after years of discovery disputes, dispositive motion practice, and a four-day trial.  The jury's verdict vindicated Mr. Plaintiff's contention that he was entitled to his full commissions according to his agreement with Dumont Aviation.  Such relief is squarely within the ambit of the Wage Act.

C.    *Reasonableness of Hourly Rates*

Defendants quarrel with the hourly rates that Plaintiff claims for Mr. Sulman ($425/hour) and Ms. Haas ($300/hour).

Instead of proposing alternative hourly rates, however, Defendants simply argue that the fee petition should be denied in its entirely.  Mr. Sullivan contends that this drastic outcome is rebutted by the evidentiary support he has provided consisting of affidavits from attorneys involved in this case, together with supporting exhibits.

In support of their draconian proposal, Defendants point to a comment in *Rosie D. ex rel. John D. v. Patrick*, 593 F. Supp. 2d 325, 329 (D. Mass. 2009), to the effect that the "First Circuit requires that affidavits be submitted attesting to the reasonableness of the rates by knowledgeable attorneys unconnected to the underlying litigation."  593 F. Supp. 2d at 329 (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1168 (1st Cir. 1989)).  In *Rosie D.*, the petitioner had filed affidavits from four attorneys unconnected with the lawsuit, which undergirded the trial judge's reasonableness analysis.

The First Circuit does indeed require a party requesting attorneys' fees to adduce evidence, "other than his own attorneys' affidavits," to establish "the prevailing hourly rate in the community for comparable legal services."  *Bordanaro*, 871 F.2d at 1168.  While third-party attorney affidavits are one

form of such evidence, they are by no means the only acceptable form of evidence.

The evidence Plaintiff has supplied, including evidence of other court awards to the same lawyers, evidence of court awards in similar cases to different lawyers, and evidence of actual hourly rates, has significant probative force. *See Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1, 16 (1st Cir. 2011) (noting that fee-seekers had shown that that "the rates used were identical to those that the same lawyers had previously received" in similar cases).  Mr. Sullivan presents copies of invoices that Mr. Sulman has sent to other clients, which reflect the regular hourly fees that he charges. *See Hutchinson*, 636 F.3d 16 ("[T]he rate that a private lawyer actually charges to clients in the ordinary course of his practice, though not conclusive, is a useful indicator of market value.").  Such evidence of actual bills to clients supplies a more meaningful foundation for a fee award than the kind of evidence a trial court typically receives; all too often, the court is presented with a predictable assortment of mutually reinforcing opinions from uninvolved third-party attorneys.

Although I reject Defendants' suggestion that I must deny the fee petition in its entirety because Plaintiff's evidence on hourly rates does not include affidavits from attorneys unconnected with the lawsuit, I am nevertheless required to

evaluate what a reasonable hourly rate would be for Plaintiff's attorneys.  In calculating a reasonable hourly rate for Mr. Sullivan's attorneys, I take into account, "the attorney's reputation, status and type of activity for which the attorney is seeking compensation."  *Pennsylvania* v. *Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 553 (1986).  I also consider "the prevailing market rates in the relevant community".  *Blum v. Stenson*, 465 U.S. 886, 895 (1984).

1.  Mr. Sulman

Mr. Sulman seeks an hourly rate of $425.  Mr. Sulman graduated from law school in 2005 and had 14 years of litigation experience at the time of trial.  [Dkt. No. 169-1].  He opened his own plaintiff-side employment firm in 2011 and since that time has been lead counsel in many employment lawsuits.  He has successfully litigated other Wage Act claims, including before the Massachusetts Appeals Court, as well as other wage and hour cases in this court.

Mr. Sulman presented two prior fee awards as supporting evidence to establish the reasonableness of his hourly billing rate.  [*Id*.].  The first was a 2017 hostile work environment claim in Middlesex County Superior Court, which awarded fees to Mr. Sulman at an hourly rate of $400.  This fee award notably also included an hourly rate of $275 for Ms. Haas, who assisted with that litigation.  Mr. Sulman also presented a fee award

from a 2016 Suffolk Superior Court case, which awarded fees to Mr. Sulman at an hourly rate of $400, although that case did not proceed to trial and Mr. Sulman was only awarded fees for 5 hours of work.

Mr. Sulman presented three invoices from other clients, between 2017 and 2019, which indicate that his hourly rate increased from $400 to $425.  [*Id.*].

Mr. Sulman also presented fee awards from two Wage Act cases in which he was not involved: a 2018 Suffolk Superior Court Business Litigation Session case and a 2017 case from this court.  [Dkt. No 169-3].  In those cases, lead counsel were awarded hourly rates of $395 and $495.

The evidence presented regarding Mr. Sulman supports Mr. Sullivan's contention that the proposed hourly rate of $425 is reasonable for his services.  Mr. Sulman has a meaningful number of years in experience as a plaintiff-side employment litigator. His client invoices and past fee awards demonstrate that his hourly rate increased from $400 to $425 over the past several years, which is a reasonable accounting for inflation and additional experience.  As points of reference, the Wage Act fee awards to attorneys other than Mr. Sulman demonstrate that the proposed hourly rate is within the range of hourly rates accepted for lead counsel in the legal community.

All this evidence supports a finding that Mr. Sulman's proposed hourly rate is reasonable.

Apart from invoking a purported "rule" whereby the court would be limited to considering affidavits from uninvolved attorneys in assessing the reasonableness of hourly rates, Defendants offer no substantive counter to Mr. Sullivan's contentions. They do not dispute that the fee awards and invoices submitted by Mr. Sulman reflect services comparable to those he provided in this case. Nor do Defendants propose what a reasonable hourly rate should be for comparable services. This deficit of presentation substantially undermines Defendants' position. *Cf. Hutchinson*, 636 F.3d at 17 ("Where as here, a prevailing party submits a supported application for fees, the fee-target runs a risk if it chooses to do no more than criticize the rates requested and point to the fact that some other judge, in some other case, has embraced a different set of rates.").

I find that Mr. Sulman has established that an hourly rate of $425 is reasonable for his services.

As noted *supra* note 9, instead of distinguishing between core and non-core activities, I will apply a blended rate. There were a few clerical activities included in Mr. Sulman's billing entries, so I will apply a blended hourly rate of $420 for Mr. Sulman.

2.   Ms. Haas

Ms. Haas seeks an hourly rate of $300.  Ms. Haas graduated from law school in 2008 and had 10 years of litigation experience at the time of trial.  [Dkt. No. 169-2].  She worked at the Massachusetts Commission Against Discrimination for a year following law school, worked at a small plaintiff-side employment law firm for several years, and joined Mr. Sulman's plaintiff-side employment firm in 2016.  She has served as second chair on four prior jury trials.  In this matter, she performed most of the discovery practice and served as second chair at trial.

Ms. Haas presented one prior fee award as supporting evidence to show the reasonable rate of her services.  [Dkt. No. 169-1].  As noted above, Ms. Haas worked with Mr. Sulman on a 2017 hostile work environment claim in Middlesex County Superior Court, which awarded fees to Ms. Haas at an hourly rate of $275. Ms. Haas did not present any client invoices.

The two fee awards from unrelated cases that Mr. Sullivan presents included fees awarded for more junior counsel.  [Dkt. No. 169-3].  In those cases, junior counsel were awarded hourly rates of $125 and $300.  The hourly rate of $125 reflected a reduction from a requested hourly rate of $285, because that fee petition did not include any information about the junior attorney.

39

Although Ms. Haas presented less documentation than Mr.
Sulman to support her proposed hourly rate, she presented
information which established her educational background,
plaintiff-side employment litigation experience, and a 2019 fee
award reflecting an hourly rate of $275.  Similar to Mr. Sulman,
the proposed hourly rate of $300 is a reasonable increase
accounting for inflation and additional experience.

The fee awards from unrelated Wage Act cases demonstrate
that Ms. Haas' hourly rate is within the range of hourly rates
accepted for junior counsel in the legal community.  All this
evidence supports a finding that Ms. Haas' proposed hourly rate
is reasonable.

Defendants do not dispute that the materials submitted in
support of Ms. Haas' billing are fair comparators for the kinds
of services performed in this case.  Nor do Defendants offer any
counterproposal as to a reasonable hourly rate for comparable
services.

I find that Plaintiff has established that an hourly rate
of $300 is reasonable for Ms. Haas' services.  As noted above,
instead of distinguishing between core and non-core activities,
I will apply a blended rate.  This is particularly applicable to
Ms. Haas, who included multiple billing entries that contained
clerical work.  Because the proportion of such entries is higher

40

than that for Mr. Sulman, I will apply a blended hourly rate of $285 for Ms. Haas.

## IV. PREJUDGMENT INTEREST

The parties dispute the appropriateness of awarding prejudgment interest for the damages as trebled under the Wage Act claim and on the Cook Commissions covered by Count III (as to which I allowed summary judgment for Plaintiff).

To start from fundamentals, Defendants acknowledge that in a diversity action state law governs awards of prejudgment interest. *See Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc.*, 246 F.3d 64, 69 n.1 (1st Cir. 2001). With respect to contract claims, MASS. GEN. LAWS ch. 231, § 6C governs prejudgment interest. It allows for such interest, "at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand. If the date of the breach or demand is not established, interest shall be added . . . from the date of the commencement of the action." MASS. GEN. LAWS ch. 231, § 6C.

As the Massachusetts cases reflect, "[a]n award of interest is made 'so that a person wrongfully deprived of the use of money should be made whole for his loss.'" *See Sterilite Corp. v. Continental Cas. Co.*, 397 Mass. 837, 841 (1986) (quoting *Perkins Sch. for the Blind v. Rate Setting Comm'n*, 383 Mass. 825, 835 (1981)).

41

In this case, Mr. Sullivan's damages from the breach of contract are comprised of commissions.  Some of these commissions accrued prior to the filing of the complaint while others accrued after that filing.

Defendants contend that these circumstances effectively foreclose any award of prejudgment interest whatsoever.  In a letter to the court, [Dkt. No. 172], Defendants argue that prejudgment interest may not be awarded for commissions that only became due after the complaint was filed.  They further argue that, for commissions that were due before the filing of the Complaint, the trial evidence did not establish the precise dollar amounts and dates attributable to each of those commissions, thus making it impossible to award prejudgment interest on those amounts.  This confusion about the sums due, Defendants argue, precludes any computation of interest, even if Mr. Sullivan would otherwise have been entitled to prejudgment interest from the date the complaint was filed.  Taking these two propositions in tandem, Defendants contend that they combine to bar any prejudgment interest award whatsoever on the damages for breach of contract.

## A.   *Prejudgment Interest on Wage Act Damage Award*

With respect to the Wage Act claims of Count I, the parties agree that prejudgment interest should be awarded only with respect to the actual sums that were due and owing.  This is a

42

straightforward application of the equitable principles that require an award of prejudgment interest in order to make Plaintiff whole for amounts that were unjustly withheld. *See McGrath v. City of Somerville*, 419 F. Supp. 3d 233, 264 (D. Mass. 2019) ("MASS. GEN. LAWS ch. 231, § 6H applies to this action, and prejudgment interest in the amount of 12% per annum will be added to any damages awarded to plaintiffs under § 148 of the Wage Act.").

The Wage Act plainly provides for trebling as liquidated damages, which will be reflected in the judgment.  But the principles that underpin awards of prejudgment interest have no bearing on the "multiplied" component of the award. Accordingly, prejudgment interest is properly computed based upon the Wage Act damage award before trebling.  *See George v. Nat'l Water Main Cleaning Co.*, 477 Mass. 371, 380-81 (2017) ("Prejudgment interest is still to be added to the amount of lost wages and benefits, and is still not to be added to the trebled portion of the judgment that previously had been punitive damages and is now characterized as liquidated damages.").

**B.  *Prejudgment Interest on Contract Claims***

Turning to Count III, the contract claims, I find Defendants' general objections are unpersuasive.  To be sure, Defendants cite some Massachusetts cases that superficially

43

support their contentions.  For the first prong of their attack,
Defendants point to cases involving lost profit awards which
include comments suggesting that prejudgment interest is wholly
unavailable for claims that mature after the filing of a
complaint.  Defendants cite a footnote in *Jet Spray Cooler, Inc.
v. Crampton*, 377 Mass. 159, 182 n. 21 (1979) ("These statutes
were not intended to award interest on damages accruing after
the filing of the action, assuming that such interest is not
actually an element of the damage itself.").  They also cite a
lost profits case from this court, *Casual Male Retail Group,
Inc. v. Yarbrough*, 527 F. Supp. 2d 172, 181 (D. Mass. 2007),
which declined to award prejudgment interest on estimated lost
profits where the jury did not indicate whether its damage award
covered time periods before or after the filing date.
Defendants also cite dicta from *Cardiaq Valve Technologies, Inc.
v. Neovasc, Inc.*, No. 14-cv-12405-ADB, 2017 WL 215961, at *1 (D.
Mass. Jan. 18, 2017), cherry-picking a quotation in which Judge
Burroughs noted that some courts have found awards of
prejudgment interest to be inappropriate in situations where
damages accrued after the filing of suit.

For the second prong, Defendants cite *Deerskin Trading
Post, Inc. v. Spencer Press, Inc.*, 398 Mass. 118 (1986), which
does indeed establish a bright-line rule whereby - in the
absence of a specific finding by the trier of fact identifying

the date of a breach – prejudgment interest must be assessed as of the date of the complaint.  *See* 398 Mass. at 125.

These precedents, taken individually or together, do not support the outcome Defendants seek.

Even if *Jet Spray* is considered in isolation from other Massachusetts cases, the footnote Defendants point to will not bear the weight they put on it.  Critically, the damages in *Jet Spray* accrued after the complaint had been filed, so running prejudgment interest from the date of the complaint would have created a windfall.  Moreover, the damages award in *Jet Spray* arose from a claim of lost profits from trademark infringement.  Because the plaintiff's actual losses in that case were undeterminable, the defendants' net profits were effectively forfeited to the plaintiff, creating a very real prospect that the plaintiff "may actually recover far more than its actual loss."  *Jet Spray Cooler, Inc.*, 377 Mass. at 182.  Under those circumstances, adding prejudgment interest would have compounded the likely windfall for the plaintiff.  Thus, the court in *Jet Spray* had no occasion to consider a situation analogous to the matter at bar.  This is also the case in *Casual Male Retail Group* as well.

Unlike the amorphous lost profits award in *Jet Spray*, the damages in this case reflect sums that were due and owing, which Defendants wrongfully withheld.  In a footnote that Defendants

45

do not cite, the court in *Jet Spray* expressly distinguished the kinds of situations where Massachusetts courts have awarded prejudgment interest on damages that arose after the filing of a complaint.  The court in *Jet Spray* explained that in those cases "the monetary award was grounded on the plaintiff's injury, and not on the defendant's wrongful profits."  377 Mass. at 183 n.24.  Where damages are based on a readily determinable injury to the plaintiff, prejudgment interest is "awarded in order to place the plaintiff 'in the same position in reference to the injury as if the damages directly resulting from the injury had been paid immediately.'"  *Id.* (quoting *Coyne Indus. Laundry of Schenectady, Inc. v. Gould*, 359 Mass. 269, 278 (1971)).

The Count III damage award here reflects specifically amounts that were owed under the parties' contract and were not paid.  Such sums are readily computed.  The damage award here represents money, in sum certain, that Defendants should have paid Mr. Sullivan in a timely fashion, but unjustly withheld. Having deprived Mr. Sullivan of the use of money they owed, Defendants must compensate him for the time-value of that money. *Cf. Sterilite*, 397 Mass. at 841-42.  To redress Defendants' breach of contract fairly, the sums awarded to Plaintiff should put him in the same position as he would have been if the contract had been honored.  This means interest should accrue

46

from the dates on which the unpaid debts came due, whenever that may be.

Whether Defendant's unpaid debts to Plaintiff accrued before or after the complaint was filed is essentially irrelevant. *Cf. Bank v. Thermo Elemental Inc.*, 451 Mass. 638, 663 (2008) (computing prejudgment interest based on approximate dates of payments, rather than "from the date of commencement of the action or from the date of the breach") (internal quotation marks omitted). The controlling principle, as recognized in the Massachusetts decisions applying §6C, is that interest should run, as nearly as practicable, from the date of the monetary harm.

This brings me to the second prong of Defendants' argument that the court is hamstrung from awarding prejudgment interest in this case. Defendants make much of the holding in *Deerskin Trading*, which recognizes that ascertaining the date of a breach of contract is a factual determination that requires discrete fact finding. In *Deerskin Trading*, because the jury had not been asked to make such a finding, interest could only run from the date of the complaint, rather than from the earlier – but undetermined – date of breach. Extending this logic, Defendants argue that, because the jury in this case was not asked to make a finding about the date of the breach of contract, no such date is ascertainable.

47

Defendants' argument misses the salient point that, in this case, the breach of contract claim at issue (Count III) was decided as a matter of summary judgment, upon a factual record that demonstrated the absence of any genuine dispute of material fact.  The pertinent finding is as follows:

> I find that the Defendants breached their contract with Mr. Sullivan with respect to the Cook aircraft and that Mr. Sullivan is entitled to unpaid commissions from the Cook aircraft from January 1, 2016 to August 22, 2017, when the aircraft was decommissioned.

[Dkt. No. 111 pp.44-45].  Accordingly, it is appropriate for the court — as opposed to the jury — to identify the starting date for prejudgment interest.  While *Deerskin Trading* cautions that fixing the date of a breach is a factual determination, the logic of that decision does not extend so far as to require convening a jury to make special findings when there is no genuine dispute of material fact.

Defendants are on stronger ground when they point out that the record is insufficient to establish the precise amounts and due dates of the unpaid commissions that predated the filing of the Complaint.  This gives some substance to their contention that "there is no basis in the record upon which staggered prejudgment interest could be awarded."  [Dkt. No. 172 p.4]. But even if it is impracticable – and arguably impermissible under *Deerskin Trading* – to fashion a minutely-calibrated staggered interest award, this does not foreclose an award of

48

interest altogether.  It simply favors a conservative computation that gives Defendants all reasonable benefit of doubt.

Here, it is easy enough to ascertain the final date as of which all the unpaid commissions, in the aggregate, had accrued. As I noted in ruling on the parties' cross-motions for summary judgment, Defendants stopped paying commissions to Plaintiff in February 2016, even though Defendants "continued to collect charter revenue from the Cook plane from January 1, 2016 through August 22, 2017, when the Cook plane left the Defendants' charter program."  [Dkt. No. 111 p.4].

Rather than adopt August 22, 2017, as the date of breach, I accord Defendants the further benefit of Plaintiff's acknowledgement that, under Defendants' billing practices, Dumont typically received payment from charter customers at the end of the month following a flight.  [*See* Dkt. No. 175 p.11 n.8].  The Cook plane left the charter program in August 2017, but the last date of billing (and concomitant obligation to pay a commission) would have been September 30, 2017.  By September 30, 2017, at the latest, Mr. Sullivan's loss of money was complete, and the amount owed by Defendants was fixed and determinable.

In sum, there is no genuine dispute of material fact that all of the Commissions owed to Mr. Sullivan had accrued no later

than September 30, 2017.  For purposes of computing prejudgment interest under MASS. GEN. LAWS ch. 231, §6C, this is the effective date of the breach.

More granular factfinding might have supported a larger award for Plaintiff.  But, as Defendants point out, the record does not permit findings as to the precise dollar amounts that were due in each month.  Accordingly, Defendants will be charged interest only as of the date when the last of these unpaid debts accrued.  Computing prejudgment interest in this manner favors Defendants to a modest degree, since the bulk of the unpaid commissions actually accrued before September 2017.  On the other hand, given that the statutory interest rate of 12% is itself a fairly crude proxy for the time value of money, using a simplified computation does not unduly prejudice Mr. Sullivan. *Cf. Thermo Elemental*, 451 Mass. at 663 (approving trial court's use of an "approximation [that] avoided using the . . . different dates of accrual that would have been required for a more precise calculation").

## V. COSTS

Plaintiff has requested costs in the amount of $6,230.78 [Dkt. No. 169] and $346.50 [Dkt. No. 177], for a total of $6,577.28.  Most of these costs are for creating deposition and trial transcripts.  Plaintiff has excluded costs of $116 that were self-identified as excessive (separate parking for two

attorneys attending the same hearing).  I find that the costs requested are reasonable.

## VI. COMPUTATION OF ATTORNEYS' FEES, COSTS AND PREJUDGMENT INTEREST AWARD

For the reasons discussed, I award attorneys' fees and costs and prejudgment interest in the following amounts:[11]

### Count I - (Wage Act) Jointly and Severally as to Dumont Charter, LLC; Dumont Aviation, LLC and Kevin Wargo

| | |
|---|---|
| As Trebled Damages (Count I): | $ 322,131.12 |
| Prejudgment interest (Count I): | $  96,209.83 |
| Attorneys' fees and costs (Count I): | $ 269,981.28 |
| | **$ 688,322.23** |

### Count III – (Contract) Jointly and Severally as to Dumont Charter, LLC and Dumont Aviation, LLC

| | |
|---|---|
| Damages (Count III): | $ 186,149.12 |
| Prejudgment interest (Count III): | $ 134,027.37 |
| | **$ 320,176.49** |

| | |
|---|---|
| Total Recovery for Plaintiff on both Counts I and III: | **$1,008,498.72** |

---

[11] I include, as Exhibit C, a detailed identification of the components of the Attorneys' Fees, Cost and Prejudgment Interest Calculations which support the Final Judgment to be entered.

## VII. CONCLUSION

For the reasons set forth more fully above, I **DENY** Defendant's Motion for Directed Verdict and Judgment Notwithstanding the Verdict [Dkt. No. 171] and it is FURTHER ORDERED THAT:

With respect to Plaintiff's Petition for Attorneys' Fees [Dkt. No. 169] as supplemented by the Plaintiff's Supplemental Petition for Attorneys' Fees [Dkt. No. 177], I GRANT the Petition for Attorneys' Fees to the extent that attorneys' fees and costs in the amount of $269,981.28 shall be awarded.

Prejudgment interest on the damages associated with the Wage Act claim (Count I) shall be computed on the basis of the damages award before trebling.

Prejudgment interest on the damages associated with the breach of contract claim (Count III) shall be computed starting from September 30, 2017.

I **ORDER** entry of judgment in accordance with the totals delineated in Section VI of this Memorandum.


_/s/ Douglas P. Woodlock_
DOUGLAS P. WOODLOCK
United States District Judge

## EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JUSTIN B. SULLIVAN,　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　　)　CIVIL ACTION NO.
　　　　　　　　　　　　　　　　　　)　16-10713-DPW
v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
DUMONT,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendant.　　　　　)

## VERDICT

1.　Has Dumont demonstrated it is more likely than not that the parties
agreed Dumont would deduct Maria White's wages and benefits from Mr.
Sullivan's compensation?

　　(ANSWER "YES" OR "NO")　　　　　　　　　_____NO_____.

2.　Which, if any, of the following categories of flights has Mr. Sullivan
demonstrated were more likely than not subject to the parties'
Employment Agreement?

　　(ANSWER SEPARATELY "YES" OR "NO" AS TO EACH CATEGORY)

　　A.　Flights booked by the Lyon's Sales Dept.　　　_____yes_____.

　　B.　Dry Lease Flights　　　　　　　　　　　　　　_____yes_____.

　　C.　Owner Charter Flights　　　　　　　　　　　　_____NO_____.

　　D.　Charter flights booked outside the Dumont
　　　　Sales Dept.　　　　　　　　　　　　　　　　　_____yes_____.

　　E.　Post-Employment Flights　　　　　　　　　　　_____yes_____.

_7/18/19_
DATE

_Debra F Dunham_
FOREPERSON

**EXHIBIT B - Page 1 of 4**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUSTIN B. SULLIVAN<br>Plaintiff,<br><br>    v.<br><br>DUMONT AIRCRAFT CHARTER, LLC,<br>DUMONT AVIATION, LLC, and<br>KEVIN WARGO,<br>Defendants. | CIVIL ACTION NO. 16-10713-DPW<br><br><br>**JURY DEMAND** |

**JOINT STIPULATION ON DAMAGES**

     In the event of a liability verdict in favor of Plaintiff as to the claims identified below, the Parties while reserving all of their available rights, claims, and defenses for trial, hereby stipulate as to the following facts regarding all of the commission damages claimed by Plaintiff:[1]

**Count I: Wage Act**

1. The total amount of the commissions that would be due to Plaintiff on his claim that he was paid at the rate of 66 2/3% of flight charges rather than 75% of flight charges for the time period of November 4, 2015 through December 31, 2015 is $2,502.95.

2. The total sales department flight charges for the time period of January 1, 2016 through February 16, 2016 are $728,518.98, such that the commission on these charges is $16,391.68.

3. The Parties agree that the amount of the deduction for the wages and benefits for Maria White included in Dumont's calculation of Plaintiff's commissions was $12,500.

---

[1] This stipulation does not include any damages under Count II alleging a violation of the FLSA.

**EXHIBIT B - Page 2 of 4**

4. Lyon Flight Charges

   a. The Lyon flight charges for the time period of November 4, 2015 through

      December 31, 2015 were $1,344,046.11.

   b. The Lyon flight charges for the time period of January 1, 2016 through February

      16, 2016 were $1,330.915.43.

5. Dry Lease Flight Charges

   a. Dry lease flight charges for the time period of November 4, 2015 through

      February 16, 2016 were $136,060.

6. Charter Flights By Owners[2]

   a. The amounts recorded by Dumont on Owner Statements for charter flights by

      owners on other owners' aircraft for the time period of November 4, 2015 through

      February 16, 2016 total $566,475.

7. Flights Booked Outside of the Sales Department

   a. Flights booked outside of the sales department for the time period of November 4,

      2015 through February 16, 2016 total $268,074.28.

8. Flights booked during Plaintiff's employment which flew after his separation from

   employment resulted in flight charges of $297,900.00.

**Count III: Breach of Contract**

1. The total flight charges for the Cook aircraft for the time period of November 4, 2015

   through August 22, 2017 were $4,028,977.09.  If the Court or jury determines that

   Plaintiff was entitled to commissions on the Cook aircraft after the termination of his

   employment, the commissions are $186,149.12 (calculated as 5% of the total flight

---

[2] This category excludes owners use of their own aircraft.

<u>EXHIBIT B - Page 3 of 4</u>

charges, less amounts already paid to Plaintiff on the Cook aircraft).

Respectfully submitted,

PLAINTIFF JUSTIN SULLIVAN
By his attorneys,


____/s/ Andrea Haas_____
Joseph L. Sulman, BBO #663635
Andrea L. Haas, BBO #671844
Law Office of Joseph L. Sulman
391 Totten Pond Rd., Suite 402
Waltham, MA 02451
(617) 521-8600
jsulman@sulmanlaw.com
ahaas@sulmanlaw.com

DEFENDANTS DUMONT AIRCRAFT
CHARTER, LLC, DUMONT AVIATION, LLC,
and KEVIN WARGO,
By their attorneys,

___/s/ Jim Hunt_____
Christine R. Fitzgerald
BBO #637906
Belcher Fitzgerald LLP
Two Oliver Street, Suite 302
Boston, Massachusetts 02110
Telephone: (617) 368-6890
cfitzgerald@belcherfitzgerald.com

Joseph Martin, *pro hac vice*
Martin Law Firm, LLC
10000 Sagemore Drive, Suite 10203
Marlton, NJ 08053
Telephone: (856) 888-7020
Email: jmartin@martinlawfirm.us

James T. Hunt, *pro hac vice*
Tenaglia & Hunt, P.A.
395 West Passaic Street, Suite 205
Rochelle Park, NJ 07662
Telephone: (201) 820-6003
jhunt@tenagliahunt.com

Dated: June 27, 2019

EXHIBIT B - Page 4 of 4

## CERTIFICATE OF SERVICE

I hereby certify that I served this document on counsel for all Defendants by ECF on June 27, 2019.

 /s/ Andrea L. Haas____
Andrea L. Haas

**<u>EXHIBIT C - Page 1 of 3</u>**

<u>Count I: Wage Act - All Remaining Defendants</u>

1.    Unpaid sales department commissions paid at 66 2/3% of flight charges rather than 75% of flight charges from November 4, 2015, through December 31, 2015.  Damages: $2,502.95. Trebled Amount: $7,508.85.

2.    Unpaid sales department commissions for the period January 1, 2016, through February 16, 2016.  Damages: $16,391.68.  Trebled Amount: $49,175.04.

3.    Deduction from Plaintiff's commissions of the salary and benefits of Maria White.  Damages: $12,500.  Trebled Amount: $37,500.

4.    Unpaid commissions on flights booked by the Lyon sales department for the period November 4, 2015, through December 31, 2015.  Damages: $30,241.04.  Trebled Amount: $90,723.12.

5.    Unpaid commissions on flights booked by the Lyon sales department for the period January 1, 2016, through February 16, 2016.  Damages: $29,945.60.  Trebled Amount: $89,836.80.

6.    Unpaid commissions on dry lease flights from November 4, 2015, through February 16, 2016.  Damages: $3,061.35. Trebled Amount: $9,184.05.

7.    Unpaid commissions on charter flights booked outside the Dumont sales department from November 4, 2015, through

## EXHIBIT C - Page 2 of 3

February 16, 2016.  Damages: $6,031.67.  Trebled Amount: $18,095.01.

8.   Unpaid commissions on post-employment flights booked from November 4, 2015, through February 16, 2016.  Damages: $6,702.75.  Trebled Amount: $20,108.25.

9.   Prejudgment interest on the total Wage Act damages, before trebling ($107,377.04) at the state interest rate of 1% per month, from April 13, 2016 to August 29, 2023 (89.6 months).  (.01 x 89.6) x $107,377.04 = $96,209.83.

10.  Attorneys' fees and costs in the amount of $269,981.28.

<u>**EXHIBIT C - Page 3 of 3**</u>

<u>Count III: Breach of Contract – Defendants Dumont Aircraft</u>
<u>Charter, LLC and Dumont Aviation, LLC</u>

    1.    Unpaid commissions on the Cook Agreement.  Damages in the amount of $186,149.12.

    2.    Pre-judgment interest on the unpaid commissions at the state interest rate of 1% per month, from September 30, 2017, to September 29, 2023 (72 months).

(.01 x 72) x $186,149.12 = $134,027.37.